SAMUEL L. GRAHAM, Administrator of the Estate of ROY GRAHAM, Deceased, Appellee, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

**Railways:** NEGLIGENCE: CREDIBILITY OF WITNESS: DIRECTION OF VERDICT.

1 In this action for the death of plaintiff's decedent while attempting to board defendant's moving vestibuled train, plaintiff relied, both on the former trial and on this trial, on the testimony of decedent's companion to establish negligence on the part of the trainmen in failing to rescue decedent; and it is held that the testimony of the witness is so inconsistent with that on the former trial and so absurd and improbable as to render it a nullity; and that the court should have directed a verdict for defendant on this issue, notwithstanding the rule that one of the rights of a litigant is to have the credibility of a witness passed upon by the jury.

**Negligence:** INJURY TO TRESPASSER: EVIDENCE.  Plaintiff's decedent was riding outside the vestibuled door of one of defendant's cars and holding on by the vestibule handles, with his feet on the lower step of the car.  It appeared from the evidence that his rescue was not dependent upon stopping the train and therefore failure of trainmen to apply the emergency brake to stop the train was not negligence.  And upon the whole case the evidence is held insufficient to show that trainmen failed to act promptly on discovery of decedent's peril.

**Pleading:** INCONSISTENT CAUSES OF ACTION: SUBMISSION OF ISSUES: PREJUDICE.  Where two counts of a petition were inconsistent and the establishment of one necessarily negatives the other, the withdrawal of one from the jury was not prejudicial to plaintiff, the jury having found in his favor on the count submitted; as it amounted to a submission of plaintiff's case in the alternative upon the inconsistent allegations, with a special finding indicating upon which ground the verdict was rendered.

**Same:** WITHDRAWAL OF ISSUES.  Where the plaintiff in a personal injury action set up a new and inconsistent charge of negligence by way of amendment, and the only evidence in support of the same was that of a witness who directly contradicted the main fact on which the negligence charged therein was based, the court had discretionary power to withdraw the charge from the consideration of the jury.

*Appeal from Monroe District Court.*—HON. D. M. ANDERSON, Judge.

SATURDAY, FEBRUARY 20, 1909.

SUPPLEMENTAL OPINION, TUESDAY, SEPTEMBER 28, 1909.

THIS is an action for personal injuries.  Verdict and judgment for the plaintiff.  Defendant appeals.—*Reversed.*

*J. C. Mabry, A. A. McLaughlin* and *James C. Davis,* for appellant.

*Chester W. Whitmore* and *N. E. Kendall,* for appellee.

EVANS, C. J.—The plaintiff brings this action as ad-

ministrator of the estate of his son, Roy Graham, who was accidentally killed in Illinois on September 17, 1901. On the date named the decedent was in the city of Chicago. He was in the company of two young men named Hooyer and Newgren, who figure as witnesses in the case. The age of the decedent was twenty years and ten months, that of Newgren was twenty-two years, and that of Hooyer was nineteen years. On the evening of the date named they approached the depot of the defendant railway company at one of the Chicago stations known as "Oakley Avenue," from the south; the depot at such station being on the north side of the tracks. As they approached, one of the overland limited trains of the railway company was just moving out of the station. It was a vestibuled train, consisting of a locomotive and eight coaches in the following order from the locomotive: Combination, three sleepers, dining car, two chair cars, tourist car. The passengers from this station were taken on from the north side of the train, and no vestibules were open on the south side of the train. Graham proposed that they board the moving train. His companions hesitated, but he, acting at once upon his own suggestion, jumped on by grasping the handles of the vestibule and placing his feet upon the lower step protruding underneath. Thereupon the other two followed his example; Hooyer taking position at the rear end of one car and Newgren at the front end of the next car to its rear. In this position Hooyer and Newgren were side by side. It is uncertain from the evidence which car Graham boarded. Both Hooyer and Newgren express the opinion that it was the third or fourth car from the locomotive; but Newgren testified that there were two or three cars between Graham and the other two, while Hooyer testified that Graham was upon the front end of the same car on which he was. Inasmuch as the plaintiff's case must stand or fall upon the testimony of Hooyer, we will discuss the same in accordance with Hooyer's testimony. The extreme danger of

their position became apparent to Hooyer and Newgren, and they made frantic efforts to attract attention to their danger so that they might be rescued therefrom. The first person who went through the vestibule, a passenger, failed to observe them, although they were then beating upon the glass door of the vestibule. A little later the negro porter of the tourist car passed through, and his attention was attracted. He passed into the car for a moment and returned with the brakeman, Wright, who immediately opened the door and rescued them. As to what was said between these parties and Wright, and between them and the conductor, we shall set forth in detail later on. In pursuance of information given by them to Wright, Wright went with them forward through the train until they met the conductor, who went with them to the forward part of the car upon which he was and opened the vestibule door in search of Graham. He was not there. The conductor took a position on the open steps of the vestibule and looked up and down the train to ascertain whether he might be clinging to any other vestibule, but he could not be seen upon any part of the train. The train left Oakley Station on time at 6:38 p. m. One mile and one block west of the station on the defendant's railway was Kedzie Avenue viaduct. The width of this viaduct was such that it left a clearance of only sixteen and a fraction inches between the inner wall and the vestibule door. The body of Graham was found upon the railway track, greatly mangled a short distance west of this viaduct.

The theory of the plaintiff is that he was brushed off by the walls of the viaduct, and that his mangled body was afterwards dragged by the train to a point west of the viaduct, where it was found. Under the evidence there can be no doubt of the correctness of this theory. The speed of the train was estimated by Hooyer at fifteen miles an hour, and by all other witnesses at twenty-five miles an hour. Plaintiff's case is based upon the alleged negligence of the

brakeman, Wright, in failing to act as promptly as he ought to have done after receiving information of the peril of Graham. It was incumbent, of course, upon plaintiff to prove not only that Wright could have acted more promptly than he did, but to prove also that such promptness would have rescued Graham before the train reached the viaduct in question. It was therefore vital to his case to prove that the rescue of Hooyer and Newgren had taken place before the train reached the viaduct, and not only that, but that sufficient time still remained to have enabled Wright, with reasonable promptness, to have rescued Graham before the train reached the viaduct. This element of the case rests solely upon the testimony of Hooyer. There was a former trial of the case. At that trial, also, this element of plaintiff's case rested upon the testimony of Hooyer alone. Upon this point, the plaintiff at that trial relied wholly upon circumstantial evidence and upon the opinions expressed by the witness Hooyer as to lapse of time and speed of train. That trial resulted in judgment for plaintiff, from which an appeal was prosecuted to this court. On hearing here, the judgment below was reversed on two grounds, namely: (1) That no negligence was proved against brakeman Wright: (2) that it appeared from the evidence that Graham had come to his death before information had come to the trainmen. At the close of all the evidence on the second trial, the defendant moved for a directed verdict, on the ground that the former opinion of this court was the law of the case, and that there was no sufficient change in the evidence to warrant the lower court in reaching a different conclusion from that arrived at by this court on the first appeal. This motion was denied by the lower court. There was a change in the evidence. The principal change, and the only one of importance, was the change of the testimony of the witness Hooyer. The defendant charges that the new testimony of this witness was in direct contradiction to his former testimony, and that it

renders his present testimony inconsistent, and that it is so manifestly untrue that it should be disregarded by the court, and that the case should still be ruled by the former opinion of this court. On behalf of the plaintiff it is contended that the changed testimony is not contradictory nor inconsistent with his former testimony nor inconsistent with his testimony as a whole at the present time. In the state of the record we think this question is practically conclusive of the case, and we direct our first attention to it.

I. The following is a part of Hooyer's cross-examination on the first trial: ·

Q. What was the conversation you had with the brakeman there? A. He said, 'What are you doing out there?' I said, 'We got on at Oakley Avenue.' He said, 'Where is your tickets?' I told him my friend on the other end of the coach, in the same position we were in on the outside, had them. He said, 'Oh, that is an old gag.' Q. Now you and Mr. Newgren had no tickets? A. No, sir. Q. You were taken in from the outside of the car? A. Yes, sir. Q. The brakeman evidently didn't believe your story? A. I do not know. Q. We will say so, he said, 'That was an old gag?' A. Yes, sir. Q. Then what did you do? A. He said then, 'We will go and see about it.' Q. You started out and went to the end of the car? A. Yes, sir. Q. Toward the place where you thought Mr. Graham was? A. Yes, sir. Q. When you got to the middle of the car you met the conductor. A. Yes, sir; when we got to the middle of the car we met the conductor. Q. The brakeman explained the situation to the conductor? A. Yes, sir. Q. Told the conductor that you two boys had been taken off of the outside of the car? A. Exactly. Q. Then you claimed that someone was on ahead? A. Yes, sir. Q. The conductor said, 'We will go and see about it?' A. Yes, sir. Q. The conductor went up with you to the front end of the car? A. Yes, sir. Q. The conductor did that without delay? A. Yes, sir. Q. But when you got there you found your friend was not there?

1. RAILWAYS: negligence: credibility of witness: direction of verdict.

A. Yes, sir. Q. The conductor went at once as soon as he was told? A. Yes, sir. Q. I say, as soon as the conductor heard it he went at once to see whether your friend was on the front of that train or not? A. Yes, sir. Q. You saw that Mr. Graham was not on the train? A. Yes, sir.

On his examination in chief at the same trial he testified as follows:

Q. After you started forward in the car with the brakeman, what happened? A. About one-half way in the car we met the conductor. The conductor said, 'Tickets, Tickets.' Then the brakeman explained to him. He said, 'Well, we will go and see about it,' and then we went right to the other end of the coach, and he reached down and opened the door, and there was nobody there. Q. What conversation, if any, did you have with the conductor at the time you and the brakeman went out there? Explain what was said by the brakeman and what the conductor said about it. A. The conductor asked for the tickets, and the brakeman explained to him that he said, 'He got on at Oakley Avenue, on the outside of the rear of the coach and hung outside, and when he got in he said his friend was on the other end with the tickets.' The conductor turned around and said, 'Well, we will go and see about it.' He went out to the other door and opened the door, and there was nobody there.

On the last trial the witness testified about his conversation with brakeman Wright substantially as before, and the following is his examination in chief from that point:

Q. After talking with the brakeman now and walking forward to the end of the one car, then you say you walked into the second car? A. Yes, sir. Q. What, if anything, did you notice as you walked across the platform between the first and second cars ahead of you? A. We noticed Roy on the outside. Q. Whereabouts? A. He was standing on the steps at the head end of the car right through the glass. Q. Did you see him there?

A.  Clearly.  Q.  Did you stop and dally in there?
A.  No, sir.  Q.  Did you try to stop the train?  A.
No, sir.  Q.  What did you do?  A.  I went to find
the conductor and wanted him to stop the train, I wasn't
acquainted with the working of the train, and couldn't
get him in.  Q.  After you passed this vestibule and
went into the second car, how far did you go in the
second car?  A.  Two-thirds of the way.  Q.  Did you
find the conductor?  A.  Yes, sir.  Q.  Just state what
occurred then.  A.  Well, we went up to him, and he
thought we were going to pass, and he says, 'Tickets.'  I
says to him, 'My friend on the outside has our tickets,
hanging on the steps on the outside,' and something was
said, I don't know just what it was.  Q.  What was the
conductor doing?  A.  Taking up tickets.  Q.  What kind
of a ticket?  A.  I think he had a mileage book, and I
think he was writing a slip.  It had some names on it.
Q.  Did he stop or complete this ticket transaction before
he did anything after you stopped him?  A.  Yes, sir;
he completed it.  Q.  What did he do after you spoke to
him in this way with reference to these tickets?  A.  He
finished the taking of the mileage and handed it back to
the party.  Q.  Then what did the conductor do?  A.
Went forward to the end of the coach, and out on the
steps and opened the door.  Q.  As he went forword did
you tell him that your friend was on the rear?  A.  No,
sir; I thought he understood so.  Q.  He opened the ves-
tibule door on the outside then?  A.  Yes, sir.  Q.  And
what happened then?  A.  He looked out and saw that
there was nobody there, and then he shut the door down.
Q.  Then what did you do?  A.  Went back in the car.

A part of his cross-examination at the second trial is
as follows:

Did you ever testify about that fact before in this
case, that you passed into the second car and met the
conductor in the second car?  A.  I don't know that I
did.  Q.  Didn't you testify to something different at that
time to what you have testified to here?  A.  I was never
asked that question.  Q.  You were asked that question,
and didn't you say that you saw the conductor about the

middle of the car that you got on? A. I don't think so.
Q. Now, Mr. Hooyer, as you were walking through into
the next car, do you tell this jury that you saw Roy
Graham on the outside of the car? A. Yes, sir. Q. Did
you point him out to the brakeman? A. No, sir. Q.
You didn't say to Newgren, 'There is Roy, get him in'?
A. I didn't see Newgren. Q. And you went on into
the middle of the next car? A. Yes, sir. Q. When you
saw the conductor he was taking a ticket at that time?
A. Yes, sir. Q. He was leisurely about it? A. He
didn't hurry any. Q. What talk did you have with the
conductor? A. He says, 'Ticket, Ticket,' as I came up
to him. I told him that 'my friend on the outside of the
car had our tickets,' and some talk passed between him and
the brakeman. I think he explained where we were. Q.
And then you went to the head of the next car, you and
the conductor? A. Yes, sir. Q. You went away from
your friend in distress? A. Yes, sir. Q. And the con-
ductor opened the vestibule door in your presence. Didn't
you tell him that 'He isn't there'? A. No, sir.

On the former trial Hooyer testified on cross-examina-
tion as follows: "Q. How long was it after you got on
the train up to the time the conductor got up to the
place you say Graham was? A. I said two and one-half
minutes. Q. You say it was two and one-half minutes
from the time you were let in until the time you got up
there? A. Yes, sir."

At the last trial his attention was directed to the cross-
examination just quoted, and the following is a part of
the cross-examination of the last trial: "Q. Did the con-
ductor ever get to the place where Roy was? A. No, sir.
Q. Why did you answer at the last trial that it was two
and one-half minutes until the conductor got to the place
where Roy was. A. From the time we got to the place
where we thought he was."

It is impracticable for us to set out more of the evi-
dence in detail. The important fact is that at the first
trial Hooyer testified that, after his conversation with

brakeman Wright, the two boys and Wright started immediately towards the forward end of the car and met the conductor about midway, where the same information was given to the conductor, and that he went with them to the forward end of the car and opened the vestibule, where he supposed that Graham would be, and found that he was not there, and that at the second trial Hooyer testified that they passed through the first car and into the second before they met the conductor, and that the conductor then went with them to the forward end of that car and opened that vestibule. The surprising feature, however, of his testimony at the second trial, was that he said he saw Graham at the door of the vestibule through which they came before they reached the conductor. No one else saw him. Hooyer does not claim to have called anybody else's attention to him. He did not tell the conductor that he saw him there. On the contrary, he went with the conductor to look for him at the forward vestibule of that car. It would be idle to say that his testimony at the second trial was not contradictory of his testimony at the first. The only explanation offered for the change of testimony is that the witness was not asked that question. This explanation is not true in fact. The witness was interrogated to the fullest detail concerning the whole matter within his knowledge. If, however, this involved nothing more than a contradiction of his former testimony—however glaring and unexplained—it may be that even then it would present only a question of credibility to be determined by the jury. We pass that now. But it presents something more than a contradiction of the former testimony. It is in the highest degree inconsistent with his present testimony. It renders his present testimony self-contradictory. The fact that he testified at the former trial that they met the conductor in the first car, whereas, he testified in the second trial that they met him in the second car, is a descrepancy to which we attach little

or no importance. That was a detail which might have been stated wrong at the first trial by mere inadvertence, and stated properly at the second. For the witness to say, however, that while in the very act of searching for Graham, in company with Newgren and brakeman Wright, he saw him through the door of the vestibule, but said no word nor did any act, except to take the conductor forward to the further end of the car to look for Graham there, presents a situation which calls for some explanation. In the absence of such explanation, it is so manifestly insincere and absurd that no person could candidly believe it. If the witness had been hostile to the plaintiff and had testified reluctantly, it might present a different situation. This witness, however, is an employee of the plaintiff and was such at the time of his former testimony.

We do not overlook the fact that there is other testimony in the record to show that the interview with the conductor occurred in the second car, and not in the first one. If we were to accept this testimony it would not help the plaintiff's case. This testimony all tends to show that Graham's position on the train was two or three cars ahead of his two companions. It is undisputed in the testimony that Hooyer and Newgren were taken in through the vestibule between the last two cars of the train, namely, between the second chair car and the tourist car. Notwithstanding Hooyer's expressed opinion that Graham got on the third or fourth car from the locomotive, he testified at both trials that he was on the front end of the same car that Hooyer himself was on. If it were incumbent upon us to pass upon the facts, it would be very clear to us under the evidence that Hooyer and Newgren were taken in at the rear of the second chair car, and that they passed forward to the first chair car, and there met the conductor, and passed by him and looked for Graham at the head of that car, and then passed on to the head of the diner, where the conductor opened the vestibule door; but we are

confining our discussion to the facts as Hooyer claims them to be.

This court has gone its full length to protect the right of jury trial against encroachment by the courts under any guise, and one of the rights of jury trial is the right to have the credibility of the witness determined by the jury. Generally speaking there are no limitations upon this rule, but there are limitations upon the application of it. The testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court. This court has seldom been confronted with a more marked case of the kind than is presented here. We are united in the opinion that it is our plain duty to so hold. To hold otherwise in such a case would make a farce of judicial proceedings. See *Hannestad v. C., M. & St. P. Ry. Co.* (Iowa), 118 N. W. 38; *Artz v. Chicago Ry. Co.*, 34 Iowa, 153; *Albrecht v. Railway Co.*, 108 Wis. 530 (84 N. W. 884, 53 L. R. A. 653); *Stafford v. Chippewa Co.*, 110 Wis. 331 (85 N. W. 1040); *Lake Erie Co. v. Stick*, 143 Ind. 449 (41 N. E. 367).

II. Holding as we do in the foregoing paragraph, it reduces the case to substantially the same evidence as was presented to this court on the former appeal. Some addi-

2. NEGLIGENCE: injury to trespasser: evidence.

tional expert evidence was introduced, but it does not change the evidence upon any controlling fact. At the last trial plaintiff introduced in evidence the watch of the deceased. It appears to have stopped at 6:50, namely, twelve minutes after the leaving time of the train from Oakley Avenue. We take it that it is offered on the assumption that the watch stopped at the time the young man met his death. That this circumstance does not aid the plaintiff is apparent from the argument of his counsel. If it took the train twelve minutes to go one mile, then it is apparent that Graham could have alighted from the train at any time

without serious danger. Plaintiff does not contend in argument that it took the train twelve minutes to go the distance. He argues that the train was probably late a few minutes. There is no evidence to such effect. If the circumstance offered is to be qualified in this manner by a mere guess, then the circumstance itself ceases to speak. One could as well argue that the watch possibly did not stop for some time after the accident. We are unable to see how the circumstances aid plaintiff's case to any extent.

The case as a whole was fully discussed by the late Justice Bishop in the opinion handed down on the former appeal. *Graham v. Chicago & Northwestern Railway Company,* 131 Iowa, 741. We will not repeat that discussion. It was held in such opinion that there was no evidence of negligence on the part of brakeman Wright. On the last trial plaintiff introduced the evidence of two experts, who testified that the train could have been stopped within a few seconds by the use of the emergency brake. The argument is that this ought to have been done by brakeman Wright. That such a sudden stop would not necessarily be fatal or injurious to passengers may be conceded, but that it would necessarily involve some degree of additional danger and a substantial increase of hazard to passengers is too self-evident to require argument. What would happen in such a case to a person hanging by a slender hold on the outside of the car is a question which seems to have been overlooked.

If there is any proof that the failure of Wright to use the emergency brake was negligence, it must be found in the additional testimony of Hooyer. If we should treat that additional testimony as true, it shows conclusively that the use of the emergency brake was not necessary to the rescue of Graham. If unnecessary, its use would have been foolhardy. When Hooyer reached the first forward vestibule, according to his additional testi-

mony, he claims to have seen Graham through the vestibule door. If that be true, Graham could have been saved then and there in a mere moment by the opening of the door. Certainly no emergency stop was necessary up to this point. Here was the time and place, but Hooyer led the procession on. He directed no one's attention to Graham. There is no claim that Wright saw him there. Here was negligence on the part of Hooyer so active and astounding as to be unbelievable. If his story could be deemed true at this point, his was the proximate negligence that cost Graham's life. Finding as we do, however, that Hooyer's evidence at this point is too self-contradictory to receive any consideration, he may be exonerated from the charge of negligence which is laid in his own evidence.

Neither Hooyer's present evidence nor his former evidence tends to show any other form of negligence on the part of Wright. According to such evidence Wright moved at once in the direction of attempted rescue. Notwithstanding his skepticism of Hooyer's statement to him, he followed him toward the forward end of the train until he reached the conductor. He turned the matter over to the conductor, as was his right, if not his duty, to do. Thereupon the conductor went with Hooyer to the forward end of that car. We do not overlook the fact that Wright testified otherwise. We are confining our consideration of the case to the alleged facts as testified to by Hooyer. He stands alone in his version of what transpired. The other evidence in the case greatly preponderates against him. We therefore shut our eyes to it. The plaintiff, at the last trial, expressly exonerated the conductor from all charge of negligence. Whether therefore we regard Hooyer's additional evidence as entitled to consideration or not, it furnishes no additional proof of negligence on the part of Wright. The case must be controlled by the former opinion of this court. Indeed, if

the question were still open, we see no way by which we could properly reach a different conclusion.

Defendant's motion to direct a verdict should have been sustained.—*Reversed.*

### Supplemental opinion on rehearing.

EVANS, C. J.—I. The plaintiff calls our attention to the fact that in the original opinion we did not formally rule upon his cross-appeal. What we did say was necessarily determinative of the cross-appeal adversely to the plaintiff. The plaintiff urges upon us a reconsideration of our former opinion insofar as its conclusions are fatal to his cross-appeal. His argument is that upon the testimony of Newgren and Brundage and Wright alone, disregarding wholly the evidence of Hooyer, he was entitled to go to the jury on the theory that Graham was on the steps of the second or third car from the engine, and that Brundage saw him there. This is based (1) upon the testimony of Brundage that he and Wright went through the vestibules of the three sleepers, looking for trespassers, and discovered none; (2) upon the testimony of Newgren as to where he thought Graham was; and (3) upon the inference which the jury might draw that Brundage did see Graham on the second or third car from the engine, notwithstanding his denial. The testimony of Newgren upon which such reliance is placed is his following cross-examination: "Q. What car did you say Roy Graham boarded as the train pulled out of Oakley Avenue? A. I think about the second or third car from the front, from the engine. Q. That would be the first or second sleeper on the train? A. I don't know how the train was made up. Q. If the train was organized with a buffet car and three sleepers, it would be the first or second sleeper that he got on? A. Yes, sir. Q. You are sure of that, are you? A. That is as near as I know. Q. You testify

to that as a fact?    A.    Yes, sir.    Q.    And you are posi-
tive of that as you are of everything that you have testified
to ?    A.    Yes, sir.    Q.    That as you boarded the train
that evening Roy Graham was on the second or third car
from the engine?    A.    To the best of my judgment.    Q.
That would be the first or second sleeper in the train?
A.    Yes, sir."

Newgren had testified on direct examination, not only
that Graham was on the second or third car from the en-
gine, as he believed, but that there were three cars between
him and Hooyer and Newgren.    Hooyer's

3. PLEADING:
inconsistent
causes of
action: sub-
mission of
issues: preju-
dice.

testimony was that there was one car only
between them.    This would put Graham on
the front end of the seventh car of the train.
Plaintiff's petition expressly alleged that
Graham was on "the forward end of the seventh car from
the head end in said train."    He never receded from that
allegation.    The allegation was supported by Hooyer's tes-
timony and the case tried upon that theory.    During the
trial, however, and after the evidence had been heard,
the plaintiff added to his petition an additional count
wherein he alleged that Graham was on the second or third
car, and that Brundage saw him there, and that Brun-
dage was negligent in not attempting to rescue him.    This
count did not purport to withdraw or qualify any allega-
tion contained in the former count.    It was apparently in-
tended to state an alternative case of negligence as a basis
for recovery, so that, if he failed in his proofs upon the
original count, he might still recover upon the additional
count on the theory that Brundage was negligent.    The
two were inconsistent, and the establishment of one neces-
sarily negatived the other.

Whether the plaintiff was entitled to have them both
submitted to the jury in the alternative, or whether the
court could and should have required him to elect, at the
close of the evidence, upon which count he proposed to

stand, we need not now determine. The court did withdraw from the consideration of the jury the charge of negligence made in the additional count against Brundage, and submitted the case as made by the original count of the petition. If the jury had found adversely to the plaintiff upon this count, he might be in a position to say that he was hurt by the refusal of the court to submit the other count, and that the jury might have returned a verdict in his favor upon that count. But the jury found in his favor upon the original count. The finding of the jury sustaining that charge of negligence was equivalent to a negative finding on the other. Both could not be true. In rendering a verdict for the plaintiff on the case as submitted to it by the instructions of the court the jury necessarily found that Graham was at the front end of the seventh car. They found, therefore, that he was not on the second or third car. Brundage, therefore, could not have been found guilty of negligence upon such finding, even though the court had submitted the issue of his negligence to the jury in the alternative.

Plaintiff argues on the theory that the jury had no chance to pass upon Newgren's testimony in cross-examination, and that they might have found upon such testimony that Graham was on the second or third car, instead of on the seventh. But the court did not withdraw such issue from the jury. It only withdrew from the jury the question of the alleged negligence of Brundage. The issue of whether Graham was on the front end of the seventh car or whether he was two or more cars further ahead inhered in the case as made by the original count, and as submitted to the jury by the court. The jury had the testimony of Newgren and Hooyer on that question. The burden was upon the plaintiff to prove upon what part of the train Graham was. Unless it was proved that he was on the front end of the seventh car, plaintiff had no case under the original count. Newgren testified to his judg-

ment that he was further forward in the train.   If the jury had accepted the testimony of Newgren in this respect, it would have been fatal to plaintiff's original count. The verdict of the jury was therefore equivalent to a finding on this specific fact.   With this finding of fact the charge of negligence against Brundage necessarily went down, and the plaintiff suffered no prejudice by the failure of the court to formally submit to the jury the question of such negligence on the part of Brundage.   Assuming for the sake of the argument that the trial court could properly have submitted plaintiff's case in the alternative upon inconsistent allegations, surely no trial court would have done so without requiring a special finding indicating upon which ground the verdict for plaintiff was rendered. Plaintiff's position on this record is precisely the same as though such course had been followed.   It is manifest, therefore, that, even if the court erred in withdrawing the additional count from the jury, the error was cured by a favorable verdict upon the original count.

II.   We may say further that in our opinion the trial court did not err in withdrawing the additional count from the jury.   We must review the action of the trial court in the light of the whole record before it, in-

4. SAME: withdrawal of issues.

cluding the evidence of Hooyer, which has been considered by us in the original opinion.   The plaintiff's argument on rehearing is based upon the supposition that the evidence of Hooyer has been wholly obliterated by the conclusions announced by us in the former opinion.   We are asked, therefore, to disregard it *in toto*, and to consider the case solely in the light of the testimony of Newgren, Brundage and Wright.   The part of the evidence of Hooyer that was held to be impossible in the former opinion was that part thereof wherein he claimed to have seen Graham through the vestibule door at the front end of the seventh car, although he made no attempt to rescue him nor to communicate the fact to

the others who were with him, but went forward with the conductor to the front end of the sixth car for the purpose of rescuing him there. The plaintiff, however, is not entitled to have his evidence disregarded *in toto,* nor was he in a position to ask the trial court to disregard such testimony either in whole or in part. The only evidence offered by plaintiff in support of either charge of negligence was that of Hooyer. This evidence directly contradicted the essential fact upon which the charge of negligence in the additional count was based. Clearly the court had power of discretion to refuse to permit such an amendment to be filed, and it had like power to strike the amendment after it was filed. Whether the court could properly submit in the alternative two contradictory claims or theories in behalf of a party having the burden of proof we do not now determine. It is clear to us that it was not bound to do so. It may be that its refusal to do so would entitle the plaintiff to an election as to which ground he would stand upon, but there was no offer or suggestion of an election in this case. In overruling defendant's motion for a directed verdict, the court announced that it would not submit to the jury the issue presented by the amendment. To this announcement the plaintiff excepted. In its instructions later the court withdrew from the jury the charge of negligence against the brakeman, Brundage. No exception was taken to this instruction by the plaintiff. It may be that the announcement of the court ought to be regarded as sustaining defendant's motion to that extent, and that an exception at that point was sufficient. In any event, we have assumed the exception to be sufficient for the purpose of his appeal. It is evident, however, that, if plaintiff preferred to submit the case to the jury upon the other theory, he had abundant opportunity to so elect. He took a submission of his case upon the original count, and his position is quite the same under the circumstances of this case as though he had formally elected to stand

thereon. From the verdict rendered it is manifest that he must have been beaten by the jury if the case had been submitted upon the other theory. So that, if we should assume the correctness of plaintiff's contention, that there was sufficient evidence to go to the jury in the testimony of Brundage and Wright and Newgren alone, it could avail him nothing in the face of the actual finding of the jury.

In this discussion we have confined ourselves to a consideration of the case as it was before the trial court. Plaintiff's argument on rehearing is somewhat anticipatory, and is directed to a supposed situation which may arise in the future. We cannot follow the argument into that field. Whether it is possible for the plaintiff to recast his issues and his evidence for a future trial is a speculation into which we cannot properly enter. Certain it is that the questions already decided by this court in the opinions on the two appeals must be deemed as the law of the case for all time so far as those questions are concerned.

The former opinion is adhered to with this modification: That it is now formally ordered that the case be affirmed on the plaintiff's cross-appeal, and reversed on defendant's appeal.—*Reversed* and *remanded*.