SAMUEL L. GRAHAM, Administrator, Etc., Appellee, v. CHI
     CAGO AND NORTHWESTERN RAILWAY COMPANY,
     Appellant.

**Railways:** TRESPASSER: CARE. One boarding a moving train and
 1  compelled to ride upon the steps because of closed vestibule
    doors is a trespasser to whom the company owes no duty
    until his peril is discovered, and then is required to act only
    with reasonable promptness to avoid injury to him.

**Same:** ACTION FOR DEATH: EVIDENCE. In an action for the death
 2  of one having boarded a moving train and was killed while
    riding upon the steps of the car, the evidence is held to show
    that he came to his death prior to any knowledge of the trainmen that he was on the car.                      .

**Same:** NEGLIGENCE. On discovering the peril of a trespasser rid
 3  ing upon the steps of a car, failure of the trainmen to apply
    the emergency brakes was not negligence, where it appeared
    that the same involved danger to the other passengers and
    that the effort to assist him from the steps to the car was
    equally as speedy and effective a means of rescuing him from
    his peril.

*Appeal from Monroe District Court.*—HON. F. W. EICHEL
                    BERGER, Judge.                      .

FRIDAY, MAY 18, 1906.

REHEARING DENIED, OCTOBER 25, 1906.

ACTION to recover damages for a personal injury resulting in the death of plaintiff's intestate, Roy Graham.    Graham was a young man nearly twenty-one years of age, and his home was in the city of Ottumwa, this state.    The acci-

dent in which he lost his life occurred September 17, 1901, and in the city of Chicago, Ill. Stated generally, the circumstances of the accident were as follows: In company with another young man named Hooyer, Graham had gone to Chicago for a visit. On the afternoon of the day of the accident they met a mutual friend, a young man named Newgren, and all three planned an evening visit at De Kalb, sixty-five miles out of Chicago, and on the line of defendant's railway. They agreed upon taking the train known as the " Overland Limited," at Oakley Avenue Station. That train was a fast through train, which left the principal station in the city at 6:30 p. m., and was due at Oakley avenue at 6.38 p. m. From there it made no stops until De Kalb was reached. Upon approaching Oakley avenue from the south, the young men discovered the train already standing at the station. They were on the side opposite from the station building and platform, and as they came up the train commenced to move out. It appears that the train was vestibuled throughout, and as the start was made from the station all the vestibules were closed on the south side. When closed, the door of the vestibule sets in about six inches from the outer line of the car, and the lower edge is on a level with a trapdoor which, when let down over the steps, forms a continuation of the car platform. Graham ran to the moving train and caught on the front end of one of the cars by grasping the handholds or rods on each side of the vestibule door, and planting his feet on the lower step. He thus stood facing the vestibule door. As the rear end of the car came up the other boys caught on in like manner. Hooyer remained standing on the step facing the door, while Newgren found a footing between the vestibuled ends of the cars. After a time Hooyer succeeded in attracting attention from the inside of the car, and he and Newgren were rescued from their position. Upon going to the front end of the car it was discovered that Graham was missing. Shortly afterwards he was found by other parties lying dead beside

the track about a mile west of Oakley avenue and near the west end of a viaduct crossing over Kedzie avenue. As no one saw the accident, the manner of its occurrence could not be told. It would seem certain, however, that he either lost his hold and fell against the viaduct structure, or was brushed off by such structure, as fresh blood was found at places thereon. The trial resulted in a verdict and judgment for plaintiff, and the defendant appeals.—*Reversed.*

*J. C. Mabry, Clark & McLaughlin,* and *James C. Davis,* for appellant.

*Chester W. Whitmore* and *N. E. Kendall,* for appellee.

BISHOP, J.— Plaintiff's action is grounded upon negligence of the defendant. One of the grounds alleged is that, when advised by Hooyer and Newgren of the peril to which Graham was exposed, the train employés failed to take such prompt and effective means as were within their reach to accomplish his rescue; and as the case went to the jury such was the only ground of negligence submitted. The plaintiff, of course, is not in position to complain of this, and accordingly we shall have no occasion to make inquiry respecting any of the other grounds alleged. By motion for a directed verdict at the close of all the evidence in the case, by request for instruction, and by motion for a new trial, defendant challenged the right of plaintiff to recover for that a case of actionable negligence had not been made out. In the motion for a directed verdict counsel for defendant state precisely the grounds of their contention, and they are as follows: First. The undisputed evidence shows that in boarding the train on the outside of the vestibule Graham acted not only in violation of the statutes of the State of Illinois, but without notice to, or knowledge on the part of, the defendant. He was therefore a trespasser and only entitled to rights as such; Second. The evidence fails to show that

defendant's employés in charge of the train were notified of Graham's presence on the train prior to his injury; Third. That as soon as notified that Graham was riding on the outside the employés in charge of the train adopted the quickest and safest way to relieve him, by going to the vestibule, where, according to the information given them, he was supposed to be riding.

I. That under the circumstances Graham was a trespasser, and acted in violation of law, is too clear for argument. The trial court so instructed the jury, and counsel for appellee do not take space to question the correctness of the instruction. Being a trespasser the defendant owed Graham no duty until his position of danger was made known to the employés in charge of the train, and then only to act with reasonable promptness in adopting such means as were available and appropriate to accomplish his rescue. *Masser v. Railway,* 68 Iowa, 602; *Burg v. Railway,* 90 Iowa, 106; *Baker v. Railway,* 95 Iowa, 163; *Earl v. Railway,* 109 Iowa, 14.

1. RAILWAYS: trespasser: care.

II. Confessedly the first information to the effect that Graham had boarded the train on the outside came to the train employés from Hooyer and Newgren after the latter had been admitted to the train; and, as we have seen, Graham fell or was brushed off at or near the Kedzie avenue viaduct. Of vital importance to plaintiff's case, therefore, is the location of the train with reference to the viaduct when such information was imparted. As we read the record, and we have gone over it with much care, these seems no reasonable grounds to conclude otherwise than at the time in question the train had passed the viaduct. This being true, there is no possible theory upon which the verdict and judgment can be upheld. We shall recite the evidence sufficiently in detail to make clear the situation. The boy Hooyer was the only witness for plaintiff who testified on the subject. He says that he was wholly unacquainted in the neighbor-

2. SAME: action for death: evidence.

hood, that he had never been there before, and has never been there since; that he did not know of the existence of Kedzie avenue or the viaduct. On direct examination he testified that he had since been informed as to the existence of the viaduct, and as to the distance thereof from Oakley avenue, and he gave it as his judgment that, at the time he was taken into the train, about one-third of the distance had been traveled. Being asked as to the rate of speed at which the train was running he answered that in his judgment it was about fifteen miles an hour. On cross-examination, he answered that from the time he boarded the car he was standing face inward, hugging close to the vestibule door, and looking steadily through the window in such door; that he gave no attention whatever to land marks or objects that were being passed by the train; that he realized he was in a position of great peril, and was frightened, and that he kept rapping on the window until the brakeman came to his relief. On the subject of the speed of the train he answered that there was not very much acceleration as they went on. " Q. They kept increasing speed as you went on? A. I never took particular notice. Q. They might have increased in speed, and you not noticed it? A. Well, they were not going very fast. Q. Are you a judge of the speed of railroad trains? A. No, sir. Q. You cannot tell a vestibule train when you see it? A. I do not know about that. Q. But you can judge as to the speed of a train? A. Well, about as near as anybody in my position, I guess." Now, for the defendant, Newgren testified in positive terms that the train had passed Kedzie avenue before he and Hooyer were taken in; that he was familiar with the viaduct, and knew when they passed it. " Yes, sir; I knew it. I had gone over it lots of times. You can tell by the sound. It is just like going over a bridge or river. When we went over, the railing of the subway just touched my back, just so I could feel it." The porter of the Pullman car who, with a brakeman named Wright, was present when Hooyer

and Newgren were taken in, testified that they were then near the Kedzie viaduct; that he could not say whether it was just before or just after, but thinks it was just after they passed the viaduct. Two brakemen and the conductor of the train each testified that within his positive knowledge the train had proceeded some distance to the west of the viaduct before the presence of the boys on the train was discovered and they were taken in. Each of such witnesses testified further that at the time the train passed the viaduct the rate of speed at which it was running was from twenty-five to thirty miles an hour.

We have not overlooked the contention in argument of counsel for appellee to the effect that Hooyer and Newgren must have been taken into the train before the viaduct was reached because the space between the car and the girder of the viaduct was not sufficient to permit of the passage of a man standing on the car steps and clinging to the hand holds; that accordingly, and if the fact as to the location of the train was otherwise than as testified to by Hooyer, all three of the boys would have brushed off when the viaduct was reached. The trouble with this contention arises out of the proof. The distance between the extreme south edge of the car step and the viaduct girder is shown to be eighteen and a fraction inches, while the vestibule door is set in six inches from the outer line of the car. There was then a clearance of fully two feet. Hooyer was a slender boy, and he says he kept his body close up to the vestibule door, while Newgren, a much larger man, was partially in between the vestibule ends. Such being the facts, it was entirely possible for both to pass through without striking against the girder. Such, then, is the state of the evidence. As it seems to us, consideration thereof from any point of view must lead to the conclusion that the train had reached the viaduct, and Graham had fallen to his death before any warning of his peril had been given. It must be manifest that at best the estimate of Hooyer as to the distance the

train had traveled can be taken for nothing more than sheer guesswork: a present guess as to a matter of fact respecting which he does not claim to have formed an opinion as of the time, and to which, as he declares, his attention had not been subsequently called until shortly before the trial, some three years after the happening of the accident. Being wholly unacquainted with his surroundings and giving not the slightest heed at the time to any object which could serve as a basis for computing distance with the eye, judgment on his part as to location was only possible by taking into account the speed of the train and estimating therefrom the distance run. Taking the circumstances as presented, it is inconceivable within our view that any judgment could have been formed by him on the subject. Here was an inexperienced boy nineteen years of age in the precarious position of clinging to the outside of a rapidly moving train; he says he fully realized his peril and was frightened thereat; that his attention was centered upon maintaining his hold, and that his hope was to attract attention by continual rapping on the window and his rescue thus be brought about. It was not a time for judgment as to any matter not directly associated with his peril; it was not a time for thought even save as connected with his chances for relief. And the witness does not pretend otherwise. His judgment is not as of that time, but of time three years later when a witness on the trial. To permit the mere opinion of such witness thus formed and expressed as to the speed of the train, and its location at the time in question, to outweigh the positive evidence of four witnesses each speaking from knowledge as to the fact involved, would be in our judgment at once absurd and wholly unreasonable.

III. But if it could be said that the conclusion reached by us in the foregoing division of this opinion is open to

3. SAME: doubt as to its correctness, still it remains to be
negligence. said that defendant was entitled to a favorable ruling on its motion for new trial based on the subject-

matter set forth in the third ground of the motion to instruct. By the third instruction given, the jury was told that the measure of duty on the part of defendant "was not to willfully or wantonly injure him after the said Graham had placed himself in a position of danger, and the employés of the defendant in charge and control of the train had actual knowledge of his position of danger, and, by the exercise of reasonable care, could have extricated him from same." In the tenth instruction it was said that, "If the conductor and brakeman, after being notified of Graham's position, could have stepped to the front end of the car and taken him in from the vestibule as quickly as the train could have been stopped by the use of the emergency, then it was their duty to go to the vestibule rather than stop the train." And in the eleventh instructions this: "In determining whether or not the conductor or brakeman should have stopped the train by using the emergency brake, you must consider the safety of the passengers on the train, and if the use of such brake would have endangered the safety of the passengers there was no duty which defendant owed Graham to so endanger the passengers." And such instructions became the law of the case. *Crane v. Railway,* 74 Iowa, 330; *Reynolds v. Keokuk,* 72 Iowa, 371. Now it is the evidence of Hooyer and Newgren that when they were taken into the car, the brakeman, Wright, demanded to know what they were doing out there, and if they had tickets. Hooyer says that he replied saying that "Graham who was on the other end of the coach in the same position he was in had the tickets." Newgren says that Wright was told simply that a friend up ahead had the tickets. Both agree that they at once started forward and when about half way through the car they met the conductor who demanded their tickets. They told him that Graham had them, and that he was on the front end of that car outside. The conductor turned back, and went with them to the vestibule, opened it, and found no one there.

The contention of plaintiff here, as in the court below,

is that upon being informed that Graham was on the front
end of the car it became the duty of the brakeman, and in
turn, that of the conductor, to act at once by setting the
emergency brakes on the train.   And it is the failure to so
act that is relied upon to sustain the verdict.   A contradic-
tion in the evidence as to what was done by Wright may be
here noticed.   Hooyer testified that Wright accompanied
them as they went forward and met the conductor, while
Wright says that he was not told that the boys had a com-
panion on the outside at the head end of the car, and that as
the boys started forward he went inside the car and sat down.
Now, as bearing upon the phase of the situation instantly
under consideration, plaintiff brought forward no evidence
save that the conductor who was in charge of the train in
question was put upon the stand and testified that the train
was equipped with air brakes; that these could be operated
either from a valve placed in the closet of each car, or by
the engineer upon signal given by pulling a rope which ex-
tended through the train and connected with an air whistle
located in the cab of the engine.   The witness further testi-
fied that in his judgment the train running at fifteen miles
an hour, could have been stopped in from four hundred and
fifty to five hundred feet.   On cross-examination the wit-
ness answered that stopping a train by use of a valve in one
of the cars, called an " emergency stop," would be very un-
wise, unless in case of very serious accident; that the effect
is to lock the wheels on the train, and is liable to injure pas-
sengers in the train.   For the defendant, several witnesses,
including the conductor, brakeman, and a division superin-
tendent, were called, and all agree that an emergency stop,
whether made by use of a car valve or from the engine, is
fraught with danger; that it is liable to injure passengers by
throwing them down if in the car aisles, or out of their seats
if sitting; that if made by use of a car valve there is especial
danger to the train, as it is liable to be torn in two.   This
is explained by pointing out that the wheels of the train

become suddenly locked while the engineer is continuing to work steam; and reference is made to instances of accident and injury thus occurring. In addition to this, said witnesses testify uniformly that less time would be consumed in going the length of a car and opening the vestibule door than would be required to stop the train, whatever the means employed. In the absence of any opposing testimony there can be no reason why such witnesses should not be believed and their evidence given controlling effect. Under the circumstances shown, therefore, it would be unreasonable in the extreme to hold that the conductor was the responsible cause of a willful or wanton injury. Conceding knowledge of the peril to Graham on the part of Brakeman Wright, it must be said for him, that in view of the uncontradicted evidence on the subject and the law of the instructions as given to the jury, he was doubly justified in not going to the car closet and setting the brakes on the train; there was the danger to the train and its passengers, and the most expeditious method of affording relief was by going to and opening the vestibule door. If then, as testified to by Hooyer, Wright started forward with the boys to go to the rescue — and plaintiff rested his case upon this theory — there can be no room for complaint of his action. If, on the other hand, as testified to by Wright, he went into the car and sat down — a proceeding scarcely believable if it had come to his understanding that Graham was clinging to the outside of the car — still there is nothing in the record from which it can be said that the work of rescue was interfered with or delayed thereby. The vestibule door was opened just as quick as it would have been had he also gone to the forward end of the car.

The considerations expressed foregoing lead to the conclusion that the motion of defendant for a new trial should have been sustained, and the cause will be remanded that such may obtain.— *Reversed.*