MARION MANN, Appellee, v. DES MOINES RAILWAY COMPANY, Appellant.

No. 46107.

1050

DECEMBER 15, 1942.

Dale S. Missildine, R. H. Work, and Jerome Smith, all of Des Moines, for appellant.

Volney Diltz, of Des Moines, for appellee.

BLISS, J.—The collision occurred within the city of Des Moines, shortly after 1 o'clock in the morning of Christmas Day, 1940. The rough drawing following will aid in describing how and where the collision took place.

The railway track shown is a part of the Douglas Avenue car line, which extends north and south along the east boundary line of Grand View Park. It is a public city park with roads and drives therein for the use of the public. The defendant owns the right of way on which its track is laid, north from Easton Boulevard which extends northeasterly along the southerly side of the park. This right of way abuts on the east side of the park. A part of one of the park roads is shown within the curved outlines just to the west of the railway track and extending to and across the track. This is the eastern exit of the park. This road across the track merges into Sheridan Avenue at and immediately west of the street railway track. In other words, the road over and across the right of way at this place connects the park road with Sheridan Avenue. Commencing almost at the south end of the crossing, the railway track runs south through a deep cut for a distance of 330 feet. For substantially this entire distance, the top of each bank of the cut is as high as or higher than the top of a streetcar. The banks taper down just as they come within a short distance of the south end of the crossing. Inside the park and along the bank

next to it just south of the crossing are a considerable number
of trees which interfere with a view toward or from the track.

A few feet north of the crossing and immediately east of the track and on the right of way, is a rectangular wooden sign erected on a post, with these words on the signboard: "LOOK OUT FOR THE CARS. RAILROAD CROSSING." This sign is indicated by the figure "3" on the drawing. On the west side of the track and just north of the park road at the crossing, and directly west of the signboard just described, is another rectangular signboard, about 3 feet long and 2½ feet wide or high, set on top of a post about 6 or 7 feet above the ground and about half way down the 3-foot embankment of the track. On this signboard are these printed words in substantially this form:

"WARNING

"DANGEROUS CROSSING

"Not sanctioned by Des Moines Railway Company.

"Drivers use it at their own risk."

The letters in the second line are about six inches high. The word "WARNING" is printed in somewhat smaller letters. The last two sentences are printed in much smaller letters. This sign is marked on the drawing by the figure "2." Just north of this signboard and west of the track is a small building used as a "waiting shelter" by those patronizing the street railway. It is built upon a slightly raised earth platform. It is marked on the drawing by the figure "1."

At the crossing, between the rails and on each side of them for some distance, earth, gravel, cinders or other substance has been filled in to make a smooth, level passageway over the track and right of way. The rails are 4 feet 8½ inches apart. The crossing at the track is about 10 feet wide north and south. The surface of the crossing is about 30 inches higher than the level of the park road immediately to the west. The approach to the track up this incline is somewhat abrupt. At the southeast corner of the crossing intersection, on a bracket arm extending from a pole on the right of way from which another bracket arm carrying the trolley wire extends, is an electric street light. On the drawing the pole is marked by the figure "5."

Prior to 1937 or 1938 this crossing had been used by the

public, and then the defendant erected a barricade blocking the passageway east of the crossing. In 1937 or 1938 a number of the residents east of the track in this neighborhood requested the defendant to remove the barricade. This request was granted. The civil engineer who has charge of matters with respect to maintenance of right of way and crossings for defendant testified that the right of way on which the track is laid east of the park is the private right of way of the defendant, and that there is no platted street across the track at that crossing. He testified:

"The crossing was closed up for a period of time. It was opened at the request of the people that live at the east side of the track and on the east side of the road, which parallels the right of way on the east. After it was opened I had some signs placed there. The same wording has been on the signs ever since they were placed there. * * *

"My best recollection is that the road was reopened in 1937 or 1938. There were several people there who wanted the road opened. We opened it up to satisfy at least a part of the public in that neighborhood. Des Moines Railway Company owned the fee to the little piece of ground over which the crossing is located. There is a park road there that runs in the form of a loop or circle that touches the right of way at this crossing. One prong from that loop takes it over the crossing. The sign was placed there as a warning, and I would say that we did not sanction the crossing. To reopen the road we took some rails down that had been planted on the east side of the track to form a barricade. We responded to the demand of various members of the public by taking down the barricade and installing the sign. As I remember I had the sign painted. *It was the intent to open the crossing up and let the public use it without regard to what I had in mind by the use of the word 'sanction'.* I caused the words, 'Dangerous Crossing,' to be put on the sign. *That was because from my knowledge as an engineer and maintenance man I considered, and still consider it, a dangerous crossing. In forming that belief I was influenced by the surrounding characteristics, such as the grade and blind stops, and that was the reason for the warning sign.* * * * There

has never been any illuminations over the signboard, and the paint is not illuminous. * * *

"The Railway Company has never dedicated the crossing. to the public as a highway. It has never been conveyed to the City." (Italics supplied.)

The plaintiff, an automobile mechanic, 36 years old, some time after 10 o'clock on Christmas Eve, went to "Sampson's Chicken Shack" at 1246 East 17th Street. He was there for about two hours and drank two or three bottles of beer while there. The place closed about 1 a. m. As he was leaving with the crowd, a married lady friend called to him and asked if he had his car and if he would take her home. His car was a 1937 Chevrolet sedan. The lady sat in the front seat with him. There were no other occupants of the car. He drove in to Grand View Park from Easton Boulevard. The broken line "ab" indicates the path of his automobile as he approached the crossing. He was not familiar with the road and did not know it led over the railway track. He testified that it was somewhat foggy, with a little snow on the ground. Another witness testified that the location is low and at that time of night there is often a mist. The day had been pleasant, with a mean temperature of 44 degrees. The automobile was traveling southeasterly at a speed of about 20 miles per hour, which he slackened to about 15 miles per hour as he turned to the left or east. He observed the rather abrupt grade as he turned east, about 25 feet from the top of the grade, and shifted into second gear and proceeded at a speed of 7 or 8 miles per hour. While the drawing, which is a tracing of part of an exhibit, is not drawn to an exact scale, it approximates 1 inch to 30 feet. From the figure "4" on the west boundary of the park road due east to the west rail of the track the distance is approximately 45 feet. The plaintiff testified that he did not know he was approaching a railway track, and did not see the signs, nor hear any warning gong or bell, nor see the streetcar until he got on the track. He then saw it approaching about 50 or 60 feet away, from the south, or his right, at a speed which he estimated to be about 40 miles per hour. He could not get the automobile out of the way and it was hit squarely on its right side and pushed north, sideways

on the track for a distance which witnesses, by estimate and by measurement, place at from 70 to 153 feet. After the streetcar was stopped, the automobile was found wrapped about the front of the streetcar. The plaintiff was lying partly under the left side of the automobile, and the lady was under the steering wheel. Both were bleeding and unconscious. The streetcar was backed away to permit plaintiff to be taken from under the automobile. The police were called and plaintiff and the lady were taken to the hospital. She had a fractured skull. Plaintiff did not regain consciousness until January 1st, and was in the hospital until the middle of February. The jury returned a verdict for $2,000.

The appellant assigns eight errors based on fifteen or more grounds of its motions to direct a verdict and for a new trial. However, these assignments and grounds are, in fact, all based upon a few propositions.

I. Appellant contends that the appellee was either a trespasser or a *bare* licensee upon its property at the time of the collision, to whom, in either event, the limit of its duty was to use reasonable and ordinary care to avoid injuring him after his position of peril was known to it. We agree with the appellant's statement of the measure of care which it would owe to either a trespasser or to a bare licensee, but we disagree with the statement that the appellee was either.

Speaking generally, a trespasser is one who is not rightfully upon the land or property of another, but enters it without the consent, either express or implied, of the owner or occupier thereof.

A *bare* licensee, sometimes called a *mere* licensee, is one who enters upon the land or property of another without objection, or by the mere permission, sufferance, or acquiescence of the owner or occupier. We have sometimes used the term "licensee" loosely and incorrectly instead of the term "bare licensee." In Connell v. Keokuk Electric Ry. & P. Co., 131 Iowa 622, 626 et seq., 109 N. W. 177, 178, the court, in its discussion approved an instruction of the trial court which clearly and correctly defined the terms "license" and "licensee" in their various legal aspects as follows:

" 'A license to go upon the land of another may be by an invitation either express or implied, or one may be licensed simply by the permission or consent of the owner of land to pass over same. A licensee by express invitation is one who is directly invited by the owner of the land to enter upon it, and such person is rightfully upon such land. A licensee by implied invitation is one who has been invited to enter upon the land either by the owner or occupier of the same by some affirmative act done by such owner or occupant, or by appearances which justify persons generally in believing that such owner or occupant had given his consent to the public generally to enter upon or to cross over his premises, and while such licensee is acting within the scope and limit of such implied invitation he has the lawful right to be where he is so invited.' "

The instruction then defined a "bare licensee" as we have stated herein. A licensee by invitation, either express or implied, is, of course, never a trespasser. And also, a bare licensee is ordinarily never a trespasser. It is also fundamental that one who is where he has a right to be is not a trespasser.

 It is uniformly stated that the owner or holder of the premises owes no duty to the unknown trespasser upon his property save that of not injuring him willfully or wantonly, and to use such reasonable and ordinary care as the circumstances demand, after his presence on the premises and his peril are known, to avoid injuring him. The following cases sustain one or both parts of this statement, in language differing sometimes in phraseology, but all to the same general tenor: Thomas v. Chicago, M. & St. P. Ry., 93 Iowa 248, 252, 61 N. W. 967; Heiss v. Chicago, R. I. & P. Ry., 103 Iowa 590, 592, 72 N. W. 787; Thomas v. Chicago, M. & St. P. Ry., 103 Iowa 649, 657, 72 N. W. 783, 39 L. R. A. 399; Clemans v. Chicago, R. I. & P. Ry., 128 Iowa 394, 396, 104 N. W. 431, 5 Ann. Cas. 1006; Graham v. Chicago & N. W. Ry., 131 Iowa 741, 744, 107 N. W. 595, 7 L. R. A., N. S., 603, 117 Am. St. Rep. 445; Gregory v. Wabash R. Co., 126 Iowa 230, 235, 238, 101 N. W. 761; Johnson v. Chicago, St. P. M. & O. Ry., 123 Iowa 224, 229, 98 N. W. 642; Doggett v. Chicago, B. & O. Ry., 134 Iowa 690, 692, 112 N. W. 171, 13 L. R. A., N. S., 364, 13 Ann. Cas. 588; Masteller v. Chi-

cago, R. I. & P. Ry., 192 Iowa 465, 469, 185 N. W. 107; Masser v. Chicago, R. I. & P. Ry., 68 Iowa 602, 604, 605, 27 N. W. 776; Ramm v. Minneapolis & St. L. Ry., 94 Iowa 296, 300, 62 N. W. 751; Marion v. Chicago, R. I. & P. Ry., 64 Iowa 568, 572, 21 N. W. 86; Burg v. Chicago, R. I. & P. Ry., 90 Iowa 106, 119, 122, 57 N. W. 680, 48 Am. St. Rep. 419; Baker v. Chicago, R. I. & P. Ry., 95 Iowa 163, 172, 63 N. W. 667; Sutzin v. Chicago, M. & St. P. Ry., 95 Iowa 304, 308, 309, 63 N. W. 709; Orr v. Cedar Rapids & Marion City Ry., 94 Iowa 423, 429, 62 N. W. 851; Graham v. Chicago & N. W. Ry., 143 Iowa 604, 616, 119 N. W. 708, 122 N. W. 573; Earl v. Chicago, R. I. & P. Ry., 109 Iowa 14, 16, 19, 79 N. W. 381, 77 Am. St. Rep. 516; Purcell v. Chicago & N. W. Ry., 109 Iowa 628, 631, 80 N. W. 682, 77 Am. St. Rep. 557; Way v. Chicago, R. I. & P. Ry., 73 Iowa 463, 466, 35 N. W. 525; Reese v. Kenyon Co., 198 Iowa 1015, 1016, 200 N. W. 600; Thomas v. Chicago, M. & St. P. Ry., 114 Iowa 169, 173, 86 N. W. 259; Davis v. Malvern L. & P. Co., 186 Iowa 884, 887, 888, 173 N. W. 262; Davis v. Town of Bonaparte, 137 Iowa 196, 205, 114 N. W. 896; Battin v. Cornwall, 218 Iowa 42, 47, 253 N. W. 842; Burner v. Higman & Skinner Co., 127 Iowa 580, 584, 103 N. W. 802; Harriman v. Town of Afton, 225 Iowa 659, 663, 281 N. W. 183; Gwynn v. Duffield, 66 Iowa 708, 713, 24 N. W. 523, 55 Am. Rep. 286.

We have set out these numerous citations for the reason that Papich v. Chicago, M. & St. P. Ry., 183 Iowa 601, 603, 167 N. W. 686, 687, contains a statement of the duty owing to a trespasser, after his peril is known, which is contrary to the rule stated in the above-cited decisions and greatly limits the duty of the property owner. This statement is as follows:

"The only duty owing such a trespasser is to refrain from wilfully injuring him after his peril is perceived, if there then be time to avoid his injury. From the vast number of cases supporting this proposition, we select a few. See Thomas v. Chicago, M. & St. P. R. Co., 93 Iowa 248, at 252; Bourrett v. Chicago, M. & St. P. R. Co., 152 Iowa 579, 582; Gregory v. Wabash R. Co., 126 Iowa 230 * * *."

Not one of the cited cases supports the statement, and the

Gregory case, 126 Iowa 230, 238, 101 N. W. 761, 763, very vigorously holds to the contrary. The court said:

"The court instructed the jury that it was not necessary, in order to entitle the plaintiff to recover, that they find that the injury was inflicted willfully or intentionally by the engineer; and of this counsel for appellant complain, taking the position that where the injured person is a trespasser, and the liability of the company is only sought to be established on the ground that, after being aware of the danger to the trespasser, the employes of the company were at fault in not avoiding such danger, the action of such employes, in order to warrant recovery, must be willful and wanton. It may be true that in some of the cases of this character this court has referred to the willful and wanton character of the acts of railroad employes in failing to take reasonable precautions to avoid injury after the trespasser was seen; but certainly this court has never announced the rule that under such circumstances the company will not be liable unless the conduct of its employes was intentional, willful, or wanton; and, so far as we can discover, the rule uniformly adhered to has been that if, after the employes in charge of the train become aware of danger to a trespasser on the track, they can, by the exercise of such care as a reasonably prudent person would exercise under the circumstances—that is, the highest possible degree of care in view of the fact that human life is involved—avert such danger, it is their duty to do so; and the company will be liable for their failure in this respect, which failure will be attributed to the company as negligence."

The statement was probably inadvertently made in the Papich case, although the writer of that opinion, in Trotter v. Chicago, R. I. & P. R., 185 Iowa 1045, 1047, 171 N. W. 572, 573, with some equivocation said:

"There was no duty towards this trespasser until he was actually seen in a position of peril. When thus seen, there was a duty not to injure him wantonly or willfully, and a duty to do everything that could in reason be done, after his peril was perceived, to avoid injuring him."

The statement in the Papich case is repudiated.

The record here clearly establishes that the appellee was not a trespasser, but was rightfully upon the crossing as a member of the public, and that appellant by its affirmative acts and general conduct, and its acquiescence in the public use of the crossing for three or four years, had expressly and impliedly invited the appellee to be where he was when his automobile was struck. Its consent that he be there may be clearly and fairly inferred from the affirmative acts, general conduct, acquiescence of the appellant, and its knowledge that the crossing was being used by the public, without any objection on its part. The record here speaks for itself on that point and elaboration by argument or discussion is needless. The conduct of the appellant in removing the barricade as requested, and making the improvements noted, can be reasonably reconciled with no other theory than an invitation to the public to use the crossing. Its maintenance and crossing engineer expressly testified:

"It was the intent to open the crossing up and let the public use it without regard to what I had in mind by the use of the word 'sanction.'"

The appellant gave to the crossing every appearance and indication that it was a public crossing—the roadway to and over the crossing, as shown by the photographs, has the marks and appearance of traffic—and it cannot relieve itself of liability for its negligence because the roadway was never platted or dedicated or conveyed to the city, or by a notice that it did not "sanction" its use and that drivers used it at their own risk. By these signs, it did not forbid the public from using the crossing. Rather, its erection of them was an invitation to use the crossing. If it had desired to forbid the use of the crossing, it need not have removed the barricade. After it had thrown open and improved the crossing for public use, and invited the public to use it, it then became bound to use the care in the operation of its streetcars over that crossing which ordinary prudence and the law demand. It could not change its duty in that respect, nor could it change the appellee from an invited licensee to a trespasser, by those signs. Furthermore, just what was the risk which drivers were to take or assume?

Was it the risk of negligence, or recklessness on the part of the appellant in operating over that crossing? Certainly not. It was only the risk incident to the operation of its cars over that crossing with the observance of such reasonable and ordinary care as the circumstances demanded.

In Croft v. Chicago, R. I. & P. Ry., 134 Iowa 411, 427, 109 N. W. 723, 729, the plaintiff, who was a depot station agent of defendant, sued for recovery because of the negligent killing of his child and for expenses incurred in caring for his injured wife. These casualties occurred in the depot office while the wife was assisting her husband in his work, and were caused by the negligence of the defendant in the operation of a freight train, which was derailed at the depot. The defendant urged that the wife and child were trespassers. The court found that both were licensees by invitation, express or implied. In affirming a judgment for plaintiff, this court said:

"It is certain that the rightfulness of her presence being established by such finding, she cannot be held to have assumed any risk other than such as might arise out of ordinary train operation. She was not called upon to expect injury resulting from an act of affirmative negligence. To paraphrase a maxim of quite general application, she had the right to act upon the presumption that the defendant would neither unexpectedly do a thing wholly unusual, or unexpectedly do a usual thing in an unusual manner. Under such conditions, the defendant was bound to expect her presence, and it was its duty to exercise reasonable and ordinary care in the operation and conduct of its trains to protect her from injury, and a failure to do so would be negligence as to her."

II. The reasons which speak against the charge that the appellee was a trespasser, as set out above, speak just as clearly and forcibly against the charge that he was "at least a bare licensee." He was not upon that crossing by the mere permission, sufferance, or nonobjection of the appellant.

"Permission involves leave and license, but it gives no *right*. If I avail myself of permission to cross a man's land, I do so by virtue of a license, not of a right. It is an abuse of language to call it a right: it is an excuse or license, so that the party can-

not be treated as a trespasser.'' Bolch v. Smith, 7 Hurlst. & N. 736, 745.

In Severy v. Nickerson, 120 Mass. 306, 307, 21 Am. Rep. 514, the court observed, in considering this subject, that:

''The distinction which exists between the obligation which is due by owners of premises to a mere licensee, who enters thereon, without any enticement or inducement, and to one who enters upon lawful business by the invitation, either express or implied, of the proprietor, is well settled. The former enters at his own risk; the latter has a right to believe that, by taking reasonable care of himself, all reasonable care has been used by the owner to protect him in order that no injury may occur.''

Both of these excerpts are taken from Flaherty v. Nieman, 125 Iowa 546, 548, 101 N. W. 280, 281.

A bare licensee enters the land or property of another at his own risk, and assumes the dangers existing or inherent in the property entered. We have said that it may be stated as a general rule of law that the owner or occupier of real property is under no obligation to make it safe or to keep it in any particular condition for the benefit of trespassers, intruders, mere volunteers, or *bare licensees,* entering without express or implied invitation. If such a one be injured, no recovery can be had. See Wilsey v. Jewett Bros. & Co., 122 Iowa 315, 319, 98 N. W. 114; Battin v. Cornwall, supra, 218 Iowa 42, 47, 253 N. W. 842; Knote v. City of Des Moines, 204 Iowa 948, 216 N. W. 52; Anderson v. Fort Dodge, D. M. & S. Ry., 150 Iowa 465, 469, 130 N. W. 391; Rodefer v. Clinton Turner Verein, 232 Iowa 691, 6 N. W. 2d 17, 21; Wilmes v. Chicago Great Western R. R., 175 Iowa 101, 107, 156 N. W. 877, L. R. A. 1917F, 1024; Burner v. Higman & Skinner Co., supra, 127 Iowa 580, 584, 103 N. W. 802; Keernan v. Spurgeon Merc. Co., 194 Iowa 1240, 191 N. W. 99, 27 A. L. R. 579; Printy v. Reimbold, 200 Iowa 541, 546, 202 N. W. 122, 205 N. W. 211, 41 A. L. R. 1423; Flatley v. Acme Garage, 196 Iowa 82, 86, 194 N. W. 180; Mc-Mullen v. M. & M. Hotel Co., 227 Iowa 1061, 290 N. W. 3. Or, as said in Nelson v. Lake Mills Canning Co., 193 Iowa 1346, 1351, 188 N. W. 990, 992:

" * * * and ordinarily, if one not so authorized or invited does enter, such person takes upon himself the risk of injury. In other words, if he be injured under such circumstances, the proprietor will not be chargeable with fault, simply because of his failure to equip his machinery with suitable guards."

Also, in Brown v. Rockwell City Canning Co., 132 Iowa 631, 637, 110 N. W. 12, 14, we said:

"It is unquestioned that he and the other boys were there out of idle curiosity, and, while their presence there may not be necessarily imputed to them as a fault, it did not impose on the defendant any particular duty to look out for their safety, in the absence of reasonable knowledge or anticipation that their safety would be imperiled by the maintenance and operation of its machinery."

It is true, however, that even in the instance of a bare licensee, the circumstances may be such that the owner or occupier of the premises might be liable for his injury. Such liability might arise if the owner knowingly permitted him to enter premises where there were traps or pitfalls or other hidden dangers, or there was active negligence on the part of the owner after the entrance of the bare licensee. See Ambroz v. Cedar Rapids Electric L. & P. Co., 131 Iowa 336, 339, 108 N. W. 540; Connell v. Keokuk Electric Ry. & P. Co., supra, 131 Iowa 622, 629, 109 N. W. 178; Hart v. Mason City B. & T. Co., 154 Iowa 741, 745, 135 N. W. 423, 38 L. R. A., N. S., 1173. We said in Wendt v. Town of Akron, 161 Iowa 338, 345, 142 N. W. 1024, 1027:

"The general rule doubtless is that an owner of premises owes to a licensee no duty as to the condition of such premises save that he should not knowingly let him run upon a hidden peril or wantonly cause him harm."

The record clearly establishes that the appellee was not a bare licensee, but was a licensee by the implied invitation of the appellant. He comes within the rule as expressed in 20 C. J. 353, and quoted in Loveless v. Town of Wilton, 193 Iowa 1323, 1331, 188 N. W. 874, 877, to wit:

1064

" 'Where the person injured was present at the place in question by the express or implied invitation of the owner or occupant, he is neither a trespasser nor a bare licensee, and as to him the general law of negligence imposes the duty of exercising due care to prevent injury.' "

 III. We have a reason for designating the appellee as a "licensee by implied invitation," rather than as an "invitee," as he comes clearly within the definition of that term as set out herein and as approved by the court in Connell v. Keokuk Electric Ry. & P. Co., supra, 131 Iowa 622, 626, 109 N. W. 178. · In the earlier and in most of our decisions the three relationships under discussion, as heretofore noted, have been designated as "trespasser," "licensee by invitation express or implied," and "bare licensee," while in some of the later decisions the term "invitee" has been substituted for the second of the above three terms. In defining the term "invitee," particularly with respect to a building or place of business, we have introduced an element of business interest to the inviter, or of mutual interest to both, which this court has never held to have been an essential element in the definition of a "licensee by invitation" in a case of the kind before us.

In Wilson v. Goodrich, 218 Iowa 462, 467, 252 N. W. 142, 144, the plaintiff contended that he was an invitee, and the defendant asserted that he was a mere licensee. In speaking of the two terms, this court said:

"An invitee to a place of business is one who goes there, either at the express or implied invitation of the owner or occupant, *on business of mutual interest to both, or in connection with the business of the owner;* while a licensee is one who goes on the property of another, either by express invitation, or with implied acquiescence, solely in pursuit or furtherance of business, pleasure, or convenience of the licensee." (Italics ours.)

This court held that the plaintiff was a *mere* licensee and not entitled to recover. A *mere* licensee was not defined. We are unable to tell what the holding of the court would have been had it found the plaintiff to have been a "licensee" as defined by the court. But, since an invitee can recover only when

there is the interest noted, we assume that it was the thought of the court that a ''licensee'' could not recover unless there was a like interest.

In Nelson v. F. W. Woolworth & Co., 211 Iowa 592, 596, 231 N. W. 665, the necessity that one to be an invitee must be on the premises on business of interest to the occupant or to both of them, in other words a customer or prospective customer, was the holding of the court. The plaintiff was held to be rightly in the store. The same matter of interest, with respect to the inviter and invitee, is also noted in Keeran v. Spurgeon Merc. Co., supra, 194 Iowa 1240, 1242, 191 N. W. 99, 27 A. L. R. 579.

The three cases are referred to and the definitions in the Wilson case are quoted in McMullen v. M. & M. Hotel Co., supra, 227 Iowa 1061, 290 N. W. 3, but in that case the plaintiff is referred to at all times as a *mere* licensee, although, on page 1069 of 227 Iowa, page 7 of 290 N. W., probably by inadvertence, is this statement: ''Recovery by a *licensee* must be based upon *wanton or willful misconduct* on the part of the party to be charged.'' (Italics ours.) That would ordinarily be true only as to a *mere* or *bare* licensee.

However, such an interest is not required in order for a licensee, by invitation either express or implied, to recover against the owner or occupant in a case of the character of this one. We have repeatedly so held.

In Croft v. Chicago, R. I. & P. Ry., 132 Iowa 687, 693, 108 N. W. 1053, 1055, an ably written opinion by Justice Bishop, the plaintiff, who was the wife of the station agent of the defendant, was accustomed almost daily to leave their living quarters in the depot to assist her husband in his work. While so engaged, a heavy freight train left the track and crashed into the depot, injuring the wife and killing the child who was with her. There was evidence that the defendant knew of this practice of the wife and either assented or made no objection thereto. The defendant contended that the wife was a bare licensee, to whom it owed no duty save to refrain from inflicting upon her wanton or willful injury. In affirming a judgment for the wife, this court said:

''Taking up the argument as made, it may be conceded that

in favor of a bare licensee on railroad property the company owes no duty to guard or repair in respect of the conditions which inhere in the property itself, or in respect of the usual and ordinary operation of trains over its tracks. And this is the doctrine of the authorities cited and relied upon by counsel for appellant to overthrow the judgment. But in the case before us a recovery was not sought on grounds calling for the application of such doctrine. The conditions inhering in the depot building had nothing whatever to do with the accident. And, as to the matter of the train operation, the contention was for affirmative and active negligence. Even as to a licensee, known to be on railway property or whose presence may reasonably be expected, the company owes the duty to avoid acts of negligence affirmative and active in character. Such is not only wholesome doctrine, but it is clearly the rule of our cases. Murphy v. Railway, 38 Iowa, 539; Clampit v. Railway, 84 Iowa, 71; Thomas v. Railway, 103 Iowa, 649. The cases arising elsewhere in which a similar rule has been adopted and enforced are quite fully collected in the opinion in the Clampit case, and we need not stop for further citation.

"Now a licensee, as that term is used in connection with railway property, and the operation of railway trains, is one who goes upon the station grounds or tracks for purposes other than transportation by permission either express or implied. The permission is express, of course, when given in terms; it is implied when the use is tolerated or acquiesced in under such circumstances, or, being known, is allowed to continue for such a length of time as that permission should be inferred. Murphy v. Railway, supra; Kay v. Railway, 65 Pa. 269 (3 Am. Rep. 628); Berry v. Railway, 124 Mo. 223 (25 S. W. 229). It follows that if plaintiff was accustomed with frequency to leave her living rooms in the depot and go into the office to assist her husband in his station work, and this was known to the officers of the defendant in charge of the division, and her conduct was acquiesced in, or at least, not objected to by them, then the rightfulness of her presence there cannot be open to question. She was, to say the least, a licensee whose presence was to be expected, and to whom the defendant owed the duty of exercising due care to avoid inflicting injury upon her. And

in this view a case was made proper to be submitted to the jury.''

·In that case, also, a notice was posted by the defendant. About a month before the accident, it tacked a notice on the waiting-room side of the office door, that no one was permitted in the office "except station employes, general officers, and telegraph repairers." The court held that this was simply a fact for the jury to consider.

In the second case, Croft v. Chicago, R. I. & P. Ry., supra, 134 Iowa 411, 109 N. W. 723, a judgment for plaintiff was affirmed. The questions litigated were similar to those in the first case. The husband recovered for the burial expense of the child and for the loss of her services, and also for expenses incidental to his wife's injuries. The defendant may have indirectly received some incidental benefit from the exercise of the license by the wife in assisting her husband in his. work, but certainly no benefit accrued to the defendant from the presence of the child in its office.

In Clampit v. Chicago, St. P. & K. C. Ry., 84 Iowa 71, 74, 50 N. W. 673, the plaintiff recovered judgment for injuries received when struck by a locomotive of defendant. He was not an employee of the defendant, but was a carpenter on his way to his work. He crossed the track at a place much used by pedestrians, just at the foot of a bluff which was approached by a stairway constructed by persons using the footway. A crossing over a ditch near the track was constructed, by someone, of railroad ties. The defendant contended that plaintiff was not rightfully on the track. In affirming a judgment for the plaintiff, the court said:

"The stairway and the ties across the ditch, as well as the path made by footmen, prominently advertised the place as a crossing used by pedestrians. No engineer or fireman passing along the tracks at that place with his eyes open, in the exercise of reasonable watchfulness and care, could have failed to see these indications of a footpath, and to understand therefrom that it was used by pedestrians, if he possessed ordinary intelligence. The defendant and the railroad company owning

the track, having through their employes and officers knowledge of the use of the footpath crossing, and having made no objections thereto, nor erected fences, walls or other obstructions to such use, will be presumed to assent to it, thus giving all who use the crossing license therefor. The plaintiff, therefore, was not a trespasser upon the railroad track, but is entitled to all the rights and protection of one rightfully upon it with the license of the defendant. He may recover for injuries resulting from the defendant's want of care, if not contributing thereto by his own negligence.''

Many cases are cited in support of the holding.

In Thomas v. Chicago, M. & St. P. Ry., supra, 103 Iowa 649, 659, 72 N. W. 783, 786, 39 L. R. A. 399, a judgment for plaintiff was affirmed on similar showing of facts. The court said:

''We believe the rule announced in Clampit's Case a just one, as applied to the facts in that case. It amounts to saying that, when the company had impliedly assented to the use of its track by persons as a footpath, its employes operating trains are charged with the duty of exercising care, diligence, and watchfulness to discover if persons are on the track at these places where they have recognized their right to be. We are not holding that at every place, and continuously along the line of a railway, the employes operating trains must be on the watch for trespassers. What we do hold is that as to persons rightfully on the track by the license and consent of the company, whether such consent be expressed in words or arise by implication, a duty rests upon the company and its employes to be on the watch for such persons at the places they may be expected to be, in view of the license and consent given.

''So, in this case, if the boy Earl was a licensee, and not a trespasser, and at a place where the company had impliedly assented to the use of its track as a footpath, it was the duty of those operating the train to exercise watchfulness and care to ascertain if persons were on said track at said place. If the jury should find that Earl was a licensee, then they must determine, in view of all of the evidence, whether the employes of

the company properly discharged that duty, and, if they did not, whether the failure so to do resulted in causing the injury.''

In Calwell v. Minneapolis & St. L. Ry., 138 Iowa 32, 36, 115 N. W. 605, 606, the plaintiff was not an employee of defendant. In reversing a judgment for the defendant on a directed verdict, the court said:

''Here the testimony shows that there was a well-defined footpath across the defendant's track. It was in the defendant's yard at Valley Junction, and was used by hundreds of people, whose duty or pleasure took them from the town to the shops of the Rock Island road, and there can be no question but what the defendant's officers and employes had full knowledge of the use being made of its track, and under such circumstances, and under the rule of the cases which we have cited, there can be no question that there was an implied license to so use its track. If this be true, it follows that the company, in the operation of its trains, owed to the users of this way the same care that it would owe the public at any highway or street crossing.''

Other decisions supporting the rule of the above-cited cases are Booth v. Union Terminal Ry., 126 Iowa 8, 10, 101 N. W. 147 (cinders had been placed between and along the tracks to smooth the way); Murphy v. Chicago, R. I. & P. Ry., 38 Iowa 539, 543, 544; Upp v. Darner, 150 Iowa 403, 407, 130 N. W. 409, 32 L. R. A., N. S., 743, Ann. Cas. 1912D, 574; Tarashonsky v. Illinois Cent. R. R., 139 Iowa 709, 713, 714, 117 N. W. 1074; Scott v. St. Louis, K. & N. W. Ry., 112 Iowa 54, 58, 83 N. W. 818; Wagner v. Chicago & N. W. Ry., 122 Iowa 360, 364, 366, 98 N W. 141; Snipps v. Minneapolis & St. L. Ry., 164 Iowa 530, 534 et seq., 146 N. W. 468.

In a supplemental opinion announced after submission of petition for rehearing in Printy v. Reimbold, supra, 200 Iowa 541, 548, 205 N. W. 211, 41 A. L. R. 1423, we recognized the distinction between an ''invitee'' as defined in the Wilson case, supra, and an ''invitee'' or ''licensee by invitation'' in cases of this kind, in the following language:

''Counsel for appellant, in a petition for rehearing, vigor-

ously argue in support of the contention urged in their briefs upon the original submission of this case, that deceased met her death while on the premises of appellee as an invitee. It is conceded that she was not an invitee within the general doctrine that one going upon the premises of another for their mutual advantage is an invitee, but it is contended that the facts of this case bring it within the class of cases in which the defendant by his conduct has allured or induced a party to use a private way in the belief that it is open for the use of the public, thereby imposing the duty upon him of maintaining the same in a reasonably safe condition. The doctrine, as stated, is familiar, and has been recognized and applied in numerous cases in this state. Ambroz v. Cedar Rapids Elec. L. & P. Co., 131 Iowa 336; Connell v. Keokuk Elec. R. & P. Co., 131 Iowa 622; Upp v. Darner, 150 Iowa 403.

"As stated in 3 Shearman & Redfield on The Law of Negligence (6th Ed.) 1855, Section 706, the doctrine is as follows:

" 'Invitation will also be implied from such long acquiescence as reasonably to give rise to the inference that it is invited, but it is not ordinarily to be inferred from mere passive acquiescence in what would otherwise be a trespass.' "

Other decisions having to do with licensees by invitation on the property of railway companies and others, which discuss the duty of care owing to them, are Whitman v. Chicago G. W. Ry., 171 Iowa 277, 153 N. W. 1023; Watson v. Wabash, St. L. & P. Ry., 66 Iowa 164, 23 N. W. 380; Gwynn v. Duffield, 66 Iowa 708, 24 N. W. 523, 55 Am. Rep. 286; Noyes v. Des Moines Club, 178 Iowa 815, 821, 160 N. W. 215; Fischer and Knorr v. Johnson, 106 Iowa 181, 76 N. W. 658; Radenhausen v. Chicago, R. I. & P. Ry., 205 Iowa 547, 218 N. W. 316.

Under the facts and the applicable law, the appellee was not a trespasser, nor a bare licensee, but he was a licensee by invitation, to whom the appellant owed the duty of exercising reasonable and ordinary care to avoid injuring him. We said in Monson v. Chicago, R. I. & P. Ry., 181 Iowa 1354, 1375, 159 N. W. 679, 686, 165 N. W. 305:

"We have repeatedly held that persons who are traveling over a highway or street crossing or places where the public is

licensed to pass, are not trespassers, and are where they have a right to be, and the railway company owes them the active duty of keeping a lookout for them.'' (Citing cases.)

With respect to warning notices at crossings, both public or private, or where persons are knowingly permitted to cross, see Johnston v. Delano, 175 Iowa 498, 506, 507, 154 N. W. 1013; Hawkins v. Interurban Ry., 184 Iowa 232, 238, 168 N. W. 234; Wiese v. Chicago G. W. Ry., 182 Iowa 508, 511, 512, 166 N. W. 66.

IV. Appellant assigns as error that the appellee has failed to establish negligence, and that, since the appellee was a bare licensee, the appellant's motion to direct a verdict should have been sustained. Our holding that the appellee was neither a trespasser nor a bare licensee answers appellant's argument on this assignment, as it is confined entirely to that single proposition, and does not touch upon the evidence supporting appellee's allegations of negligence, which fully sustain the verdict of the jury. It was a dangerous crossing, and the appellant fully realized it. The motorman testified: ''This is not a bad crossing for the street cars. It is for the motorists.'' He also testified that in coming from the south a motorman could not see a vehicle until it was on the track. He applied the emergency brake when he was 25 or 30 feet from the crossing. He was going downgrade. The rail was ''slick,'' as he puts it. He said his speed was 25 miles an hour, and that on a dry rail he could stop the car in about 70 feet. The jury could fairly have found that he was going much faster, as there was evidence that the automobile, weighing 3,000 pounds, was pushed sideways 153 feet with the four wheels hitting the ties. The evidence warranted the jury in finding that the streetcar was traveling at an excessive rate of speed, without proper control, and without warning. On the latter ground, the appellant insists that the negative testimony of the appellee does not create a conflict in the evidence. Appellee testified: ''I did not hear any warning signal, such as a bell or a whistle, or anything of that sort, from the street car prior to the time the street car struck my automobile.'' He was driving slowly for some distance before reaching the crossing, and slackened his speed to 7 or 8 miles

an hour as he reached the track. He was at all times close to the track and to the crossing. He saw the streetcar approaching 50 or 60 feet away, at a speed which he estimated at "anyhow 40 miles an hour." As stated in Hoffard v. Illinois Cent. Ry., 138 Iowa 543, 550, 110 N. W. 446, 449, 16 L. R. A., N. S., 797, quoting Wigmore on Evidence, section 664, "' * * * the only requirement is that the witness should have been so situated that, in the ordinary course of events, he would have heard or seen the fact had it occurred.'" This requirement was met. He was on the spot, and not a long distance away in an enclosed house. The probative value of the so-called affirmative or positive testimony might fairly be questioned. Two passengers, of the few on the streetcar, in addition to the employees of the appellant, testified as to any warning. One of them said nothing about hearing any bell being rung or gong sounded. He testified that the first thing he heard was the noise of the emergency brakes. The other witness said he heard the electric bell ring, and the whistle blow, continuously for such a time as the car would travel approximately a quarter of a mile. There was no whistle on the streetcar, so that he was mistaken about that, and no other witness gave any such testimony as to the ringing of the bell. The motorman testified that he rang the bell. Two other employees of the appellant, who were riding home on the streetcar, did not entirely agree as to when the bell rang. They were interested as employees of the appellant, and as co-employees of the motorman. The weight and credibility of the witnesses on each side was for the jury, and not for either court, to decide. It was an "owl" car, and the last run for the motorman. The passengers were few, and the last stop had been at Easton Boulevard, a half mile or more away. It was a downgrade run. The evidence fairly indicated that other rules of care which common prudence demanded had not been observed. It was for the jury to say whether warning signals had been given. We find no error on this point.

V. Appellant assigns error for the failure to sustain its motion to direct a verdict because of the contributory negligence of the appellee in going upon the tracks in the manner in which he did. He did not stop, look, and listen, it is true, but

we cannot say that this was contributory negligence as a matter of law. He was not familiar with the crossing. He testified that he did not know he was approaching a railway crossing, and the photographs indicate that this is not surprising. The rails of the track could hardly have been discernible by him. The headlights of the automobile were pointed southeast until he was about 20 or 25 feet from the crossing and turned east. The headlights would not even then shine on the ''dangerous crossing'' sign, which was to his left and too high. The west bank of the cut obscured a view of the streetcar until it was practically on the crossing. This issue was also for the jury.

VI. Appellant assigns error because the court referred to its vehicle as a streetcar, instead of an ''interurban'' car, upon the theory that the rules of care in the operation of an interurban car, as bearing upon its operator, and the drivers of other vehicles, were somewhat different than in the operation of a streetcar and more favorable to appellant. We see little merit in this contention. First, because no such claim was ever made during the trial. It was not mentioned in appellant's pleadings. The word ''interurban'' was not mentioned in the trial. The car was described as a streetcar by all of appellant's employees as witnesses. The only basis for this contention is that two witnesses incidentally mentioned that the Douglas Avenue cars ran to the city of West Des Moines, but the issue now raised was never called to the attention of the court in any way, by pleading or requested instructions, or otherwise, until the motion for new trial. The appellee was never given an opportunity to answer any such claim on the trial. While the matter need not be considered by this court, it appears to us that there is no merit in this contention. Whether the car was or was not at times operated as an interurban car, at the time of the collision it was being operated in the city of Des Moines, over a crossing used as a public street or highway, as a streetcar, and subject to all of the law and rules incident to such operation.

VII. Appellant assigns error because of the italicized portion of instruction No. 7, which the court gave in these words:

''You are instructed that it is the duty of those who use

the public streets to exercise ordinary care for the safety of the lives, limbs and property of themselves and others. *The duty of care to avoid collision that rested both upon the motorman of defendant's moving street cars, and upon the plaintiff in driving his automobile at the time and place of said collision, was equal and reciprocal.* The motorman of the defendant's street car, as well as the plaintiff in driving the automobile under the circumstances as disclosed by the evidence in this case, were both bound under the law to keep a lookout for approaching vehicles, and each was required at the time to exercise ordinary care in the operation of their respective cars.'' (Italics supplied.)

Appellant argues that it had a superior right over appellee in that it had the right of precedence. If this be conceded to be true, nevertheless the statements of law in the instruction are correct. See Hart v. Chicago, R. I. & P. Ry., 56 Iowa 166, 171 et seq., 7 N. W. 9, 41 Am. Rep. 93; Grace v. Minneapolis & St. L. Ry., 153 Iowa 418, 425, 133 N. W. 672; Black v. Burlington, C. R. & M. Ry., 38 Iowa 515. The italicized portion is nothing more than a statement that each should use ordinary care. If appellant desired a fuller statement of the law, it should have requested it. We find no reversible error.

VIII. The automobile of appellee was wrecked beyond repair. It appears by the testimony on both sides that after the collision the automobile was junked and the appellee received $50 for the junk. He had testified that its reasonable market value before the collision was $355. The court limited the recovery on this item to $305. Appellant complains that there was no specific evidence of the reasonable market value of the automobile after the collision. There appears to have been no objection to any of the value testimony. The condition of the wrecked car had been described. As an automobile, it then had no market value. The rule of Langham v. Chicago, R. I. & P. Ry., 201 Iowa 897, 208 N. W. 356, was substantially complied with. See Monson v. Chicago, R. I. & P. Ry., supra, 181 Iowa 1354, 1364, 159 N. W. 679, 165 N. W. 305. The appellant was in no way prejudiced.

The appellant stressed the matters with respect to intoxicating liquors during the trial and in argument to this court. But, there is no testimony that the appellee was in any

way intoxicated. The appellant introduced a signed statement of appellee, which it had taken from him soon after he left the hospital, that he had drunk two bottles of beer during the evening but not enough so he could feel it. The proprietor of the "Chicken Shack" testified that when the appellee left his place in the automobile "he talked with good sense, he didn't act like he was intoxicated. He walked straight. I would say he was normal in his conversation and actions." After the collision a bottle was found in the car with some liquid in it having an alcoholic odor. The police took it, but it was not produced at the trial. Appellee said he knew nothing about it and had drunk nothing but the beer. The doctor who took care of him at the hospital gave no testimony as to any evidence of liquor.

We have considered all errors assigned and carefully read the record and all authorities cited by appellant. We find no reversible error.

The judgment is affirmed.—Affirmed.

WENNERSTRUM, C. J., and MITCHELL, STIGER, OLIVER, HALE, and GARFIELD, JJ., concur.

MILLER, J., specially concurs.

MILLER, J. (specially concurring)—I agree with the result reached by the majority opinion herein and the decisions made on those propositions which appear to be essential to a determination of the case, but I doubt the advisability of including a substantial portion of the discussion set forth in such opinion. In division I, quite a number of authorities are cited and discussed for the purpose of determining the duty owed to a trespasser. The opinion then states, "The record here clearly establishes that the appellee was not a trespasser." While the discussion relative to whether the appellee was a trespasser appears proper, a discussion of the duties owed to a trespasser is dictum and unnecessary to a decision of the case. In division II, the opinion discusses the duties owed to a bare licensee and states, "The record clearly establishes that the appellee was not a bare licensee." Such holding renders a large portion of division II dicta and unnecessary to a decision of the case. In division

III, it is held that appellee was a licensee by implied invitation. Considerable discussion is had with regard to the duties owed such a licensee. I think there is a distinction in such cases regarding the duties owed by a railroad company to such a licensee. This distinction arises because of the type of property comprising a railroad right of way and the use made of it. Much that can be and has been said regarding duties of railroad employees to give warning and maintain a lookout for such licensees upon a railroad right of way is not applicable to the employees of other types of landowners. Accordingly, I think much of the discussion in division III is dictum and unnecessary to a decision herein.