ANNA STADTHERR v. CITY OF SAUK CENTER AND ANOTHER.[1]

June 6, 1930.

Nos. 27,812, 27,813.

[1]Reported in 231 N. W. 210.

*Donohue, Quigley & Donohue,* for appellant Anna Stadtherr.
*Orr, Stark, Kidder & Freeman,* for appellant milling company.
*L. L. Kells,* City Attorney, and *Henry H. Sullivan,* for city of
Sauk Center, respondent.

WILSON, C. J.

Plaintiff, as the representative of the estate of Arthur Stadtherr,
seeks to recover for the death of the decedent. The child was five
years, seven months and twenty days old at the time of the drowning

in a forebay. Defendant city owned the premises, other than the street, which it leased to the Central Minnesota Power & Milling Company, herein referred to as the milling company, which was in exclusive possession thereof. The city bought the same from the milling company in 1926, it having been the owner for many years previously. The court directed a verdict for defendant city, and the jury rendered a verdict against the milling company for $3,500. Plaintiff appealed from an order denying her motion for a new trial as to the city. Defendant milling company appealed from an order denying its alternative motion for a judgment non obstante or a new trial.

Sauk River passes through the city of Sauk Center from the west to the east. Main street intersects the river at right angles. It is 82½ feet wide, having a substantial bridge across the river. The bridge may be 200 feet long. It has on each side separated walks for pedestrians.

According to the plat Main street extends to the water line on either side of the river. The water was formerly lower than now and because thereof a portion of what was once a part of Main Street is now under the water.

The driveway on the bridge is about 20 feet wide. This necessitates a diagonal turn of the sidewalks on Main street, as one approaches the south end of the bridge, toward the center of the street so as to bring them in line with the sides of the bridge. This seems to be substantially across the width of the sidewalks and boulevard, the street being curbed and guttered; the outside railings on the bridge are in line with the curbs of the street.

Along and outside the diagonal sidewalks converging to the bridge are fences. The easterly one carries a sign "Danger—Keep Off." The fence to the west of the road and that which we are mostly concerned with is apparently built with iron pipes and consists of two parallel pipes and iron posts. It extends to within about two feet of the westerly line of the street. On a large pole by this fence is the sign "Danger." Around the westerly end of this fence is a well beaten path leading down to the southerly end of the screen

and plank walk hereinafter mentioned. The ground within the border lines of Main street and northerly of the fences has never been in condition for travel by vehicles and has been used only by pedestrians. Such use has been by employes of the milling company and by the public. Many people have used these premises for fishing and recreation. Immediately to the west of Main street and extending from the waterfront southerly about 300 feet is a public park that extends westerly along the shoreline about one-fourth of a mile. The park is used extensively. In the park and within about four feet of the west end of the iron pipe fence is an old pump house now used for storage purposes. North of that is an old concrete building. Between that and the water's edge the ground is too rough and stony for the park man to operate a lawn mower so he cuts grass and weeds there with a scythe. This rough ground is a part of the park grounds but for reasons indicated has a limited use therein. It connects the desirable park grounds with the lines of Main street and comes within three or four feet of the south end of the plank walk.

Under the bridge is a mill dam holding a body of water to the west called Sauk Lake. Along the south bank of the river under the Main street bridge is a flume or millrace through which water flows for power purposes. The forebay is 20 feet wide. The water therein is eight to ten feet deep. It is constructed by steep stone walls, the south one being along the south shore line of the river. Across the head of the forebay or canal a few feet east of the west line of Main street, if extended northerly, is a trash rack or screen constructed by timbers, including 2 x 6 pieces placed perpendicularly about three inches apart, and along the easterly side thereof is a 24-inch plank walk. The screen and plank walk are not at a right angle with the south shoreline but come to the shore from the northeast forming a V shape. The purpose of this screen is to catch weeds, grass, vegetation and rubbish that may float in the water so that they will not interfere with the operation of the gates or wheel pit 20 to 30 feet to the east through which the water is supplied as needed. The accident was on July 4, 1928. It was a holiday. The mill was

not being operated, and there was no current in the forebay. The water was then still.

It was the duty of one of the employes of the company to keep the screen clean and to remove the accumulations which were thrown upon the bank at the south end of the plank walk. This rubbish consisted mostly of grass and was hauled from the bank about once a year. The rubbish was piled upon a path leading down from the westerly end of the iron fence above mentioned. This path and the grounds within the border of Main street so adjacent to the water were used by many people as hereinbefore mentioned, including children, all of which defendants well knew.

At the time of the accident the rubbish pile so accumulated on the bank "was about four feet high in the middle and sloped down to nothing at the edge." The pile was round with a diameter of seven or eight feet. Some of the pictures in evidence would indicate the general appearance of a muskrat house and that the rubbish pile, as some of the testimony states, was partially on the south end of the plank walk.

The child apparently went to this place to fish, as many others did. He found a ten-year old boy there fishing. Both were on the plank walk. Using a drop line, the child caught a fish. The older boy, thinking the child needed help because of his youth, took the line and fish and went upon the south bank, passing upon and over the rubbish pile. The child followed. The older boy says the child "was right on the corner of the plank; was ready to step off when he fell in." He was drowned.

█ The claim is that the place and cause of the childs falling rest in conjecture and that recovery must fail. The place termed the "corner" of the plank is the lower point of the V formed by the screen and plank walk joining the stone wall on the south bank. There is evidence that the grass and rubbish hung over this corner. The manager of the milling company testified that if the grass was thrown in the pile so that it hung over the "corner" as indicated it would make a dangerous place. . Perhaps that is obvious. When the older boy saw the child in the water immediately upon his fall-

ing in, he was one foot from the shore and one foot from the plank walk. No one saw him fall.

Within about an hour thereafter the father of the child examined the south end of the plank walk and the rubbish pile, and he testified that the rubbish extended over on the plank and extended over on the stone wall covering the lower part of the V hereinbefore mentioned. He stated that in "this little corner," the V-shaped place, the rubbish was "broken down and was hanging into the water or down towards the water." This was immediately above the place where the other boy first saw the child in the water. The father there saw floating in the smooth, still water grass and weeds similar to this grass that was reaching across the corner and similar to that which had been broken down. The grass that he saw on the water did not float in from the wild because it was in behind the screen, and it apparently could come from but one source. Its presence and condition were significant. It appeared to be a "fresh break." Some of the rubbish was broken down in a space of 18 to 20 inches across the bottom of the V. It was described as thicker next to the stone wall and thinner toward the plank walk. What made the change? Apparently there was but one thing.

We are of the opinion that this evidence and permissible inferences therefrom reasonably support the conclusion that the child fell into the water because of the rubbish being piled across the V corner without any support thereunder and in such manner as to appear to be safe to walk upon. The determination of the cause of the falling does not rest in speculation and conjecture. Mitton v. Cargill Elev. Co. 124 Minn. 65, 144 N. W. 434; Id. 129 Minn. 449, 152 N. W. 753.

■ The court submitted to the jury the question as to whether a portion of Main street had been abandoned. This related to the place where the rubbish was located. Perhaps counsel claimed all north of the diagonal fences leading to the bridge and the ground under the bridge was abandoned. To define the area claimed would present difficulties. The public bridge was there. No one could tell

the demand of the future for the use of any of the ground in question. All knew that the two diagonal fences and signs had reference to water dangers. If the street was vacated, the city, owning the park, being an abutting owner, would own to the center of the street, including the place where the rubbish was piled.

It can hardly be said that the city did anything more than not to use the portion of Main street here involved. Nonuse alone for any length of time will not operate as an abandonment of a street. Parker v. City of St. Paul, 47 Minn. 317, 50 N. W. 247; 4 McQuillin, Mun. Corp. (2 ed.) §§ 1516 and 1735. This portion of the street was never opened for vehicle traffic. The presence of the bridge as constructed made this unnecessary. It was used by pedestrians. It might as well be said that a space of one, two or three feet at the extreme sides of a trunk highway is abandoned because it is not in fact used by the vehicles of the traveling public.

■ Counsel claims that the milling company gained title by adverse possession. This claim seems to rest on the fact that in 1916 it put up signs "Keep Off—Danger." It is said that this was done as owner of the property. Yet the testimony of this witness cannot establish such adverse title against the city. That title, if so acquired, must have been acquired prior to March 18, 1899. L. 1899, p. 65, c. 65. None of the present officers of the milling company were its officers then. The record is silent as to conduct or claims of the milling company prior to 1916. Indeed there is nothing to indicate that it ever had actual possession of the ground or assumed ownership thereof.

Our attention is not called to any words, acts or conduct of defendant milling company prior to 1899 having any tendency to establish the essential elements of adverse possession. It cannot therefore be successfully claimed that any part of the street was lost by adverse possession.

■ Was the child a trespasser? This inquiry is sufficiently answered by the conclusion that the street had not been lost by adverse possession and that it had not been abandoned. We need not therefore discuss the otherwise pertinent inquiry as to whether the

milling company would by such conduct subject itself to liability since it knew that small children frequented the place where the rubbish was piled and it in no way did anything to warn them of the particular danger. Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 113-114, 205 N. W. 889, 45 A. L. R. 973. The signs that were up were put up in reference to the conditions generally in the absence of this specific one.

■ The facts do not invoke the doctrine of the turn table cases or attractive nuisance. That doctrine cannot be construed as applying to the forebay and the plank walk thereover. Nor can it apply to the danger incurred by the overhanging of the rubbish pile because the rubbish pile did not have the characteristics constituting an invitation to meddle. Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 205 N. W. 889, 45 A. L. R. 973.

■ If plaintiff may recover herein it must be upon the theory that the milling company under the circumstances was guilty of negligence in the manner in which it placed the pile of grass and rubbish. There is evidence that it was piled as hereinbefore mentioned. It was so piled in the path leading to the plank walk. Its hanging over the corner at the bottom of the V formed by the screen's diagonal contact with the stone wall constituting the bank concealed the line of the plank and the stone. The milling company knew that persons, including children, continually walked over the rubbish pile. So piled, grass and rubbish exposed such persons to unnecessary danger that was not readily observable. No notice or warning was given of the danger thereby created. So placed in the walk, it was rather an invitation that the place was suitable to walk upon. The milling company knew that these grounds were so used not only by people coming there to fish but by people who frequented the park on the adjacent grounds. It presumably knew that the public had a right to be upon the ground where the grass was so piled on the shore. The rubbish could easily have been piled properly; it could have been removed more frequently; or a railing or fence at the shoreline could have furnished protection. The expense of any of these would have been trivial. The child having a right to be on

the ground at the place of the accident, it was the duty of the milling company, knowing of his probable presence, to exercise ordinary care for his safety.

We are of the opinion that the evidence was sufficient to warrant the court's submission of the question of the milling company's negligence to the jury as it did.

■ The recovery resting exclusively on the affirmative act of the negligence of the milling company, and the city, not being chargeable with knowledge thereof, a verdict was properly directed for the city.

■ The milling company assigns as error the failure of the court to tell the jury that actionable negligence must be the proximate cause of the death. It is sufficient to call attention to the fact that while the court did not use the words "proximate cause," it did say: "If it [milling company] was negligent, then it would be liable for the results that naturally and directly followed from its negligence." This conveyed the same meaning and was sufficient. Perhaps it was more readily understood. Anyway, it was the substantive equivalent therefor.

■ Under authority of our decisions collated in Luther v. Dornack, 179 Minn. 528, 229 N. W. 784, the verdict was not excessive, though liberal.

Both orders are affirmed.