# FRANK HARNING v. CITY OF DULUTH.[1]

July 3, 1947.

No. 34,413.

*Harry E. Weinberg,* City Attorney, and *Harry T. Lathrop,* Assistant City Attorney, for appellant.

*Lewis, Hammer & Heaney,* for respondent.

MAGNEY, JUSTICE.

Defendant appeals from an order denying its alternative motion for judgment or a new trial.

[1]Reported in 28 N. W. (2d) 659.

LeMagie Creek in the city of Duluth flows from the heights above the city to St. Louis Bay. In a distance of 3,000 feet it has a 500-foot fall. It crosses West Eighth street between Thirty-ninth and Fortieth avenues west, flowing between the residences numbered 3913 and 3917 West Eighth street. It passes diagonally under the street through two culverts, each 72 inches in diameter. Above the culverts and the street a pond forms, 10 to 20 feet wide and upwards of 100 feet long. On March 2, 1945, Ronald Harning, four years old, fell through a hole in the ice of this pond and was drowned. An action was brought by the special administrator of his estate against the city alleging that the accident was caused by its negligence. A verdict of $3,350 for plaintiff was returned by the jury.

Deceased did not live in the neighborhood of this creek. On the day in question, he, with his mother and sister, six years of age, were visiting friends who lived along the creek below Eighth street. About four o'clock in the afternoon, deceased, his sister, and another child seven years old went out to play, crossed the street to the upper side, walked out on the ice, with the result stated.

Every winter ice formed on the pond above the culverts. Small children of the neighborhood, 8 to 12 in number, shoveled off the snow and used the ice as a skating rink and for sliding. The marks of skates and sleds showed on its surface. A playground with a skating rink was maintained by the city about a block away. At the time of the accident, this skating rink had been closed for the season. The ice on the pond was about two feet thick, and the distance from the water to the under side of the ice was about two feet. At the time of the accident no water was flowing over the ice.

For several years prior to this accident, the city had steamed holes in the ice of the pond above the culverts. It used a portable steam boiler, erected on a truck, with a hose attached to the boiler. The steam was turned on to thaw the ice. Frank Werschay, superintendent of maintenance of the city, stated the purpose of the steaming as follows:

"When the ice gets so high up on the culvert that there is danger of it overflowing the road and it is backing up, they naturally have

to steam it out in order to keep the water going because otherwise it will go in onto private property around there and flood into their basements and yards and everything else."

He also said that if the water should get high enough it would overflow Eighth street. The holes put in were small holes, 2 to 4 inches in diameter. If water was running on the surface of the ice, it would go underneath through these holes. The object was to get the water underneath so that it would not keep building up the ice to the top of the culverts. The water running enlarged the holes, and if the weather was such that the ice got honeycombed the hole would enlarge. The ice sloped toward the holes and was smooth and slippery. The testimony was undisputed that the city steamed several holes through the ice above the culverts. There was some dispute as to where these holes were located and their number. The evidence supports the contention that the hole into which Ronald fell was one created by defendant. There was also a dispute as to when this steaming was done. The witnesses for plaintiff claimed that it was done two to three weeks prior to the accident, while employes of the city testified that it was done early in February and that periods of severe cold weather which intervened between the steaming of the holes and the time of the accident froze them so that they were closed. There is sufficient evidence to support plaintiff's contention that the holes were steamed at the later date and that they continued to grow larger day by day through water action as the season went on. Sometimes the water overflowed the ice. At the time of the accident the holes were up to two feet in diameter.

■ The court submitted the case to the jury in the following manner, quoting the clear-cut language of its memorandum:

"The court charged the jury that in order to recover plaintiff must establish by a fair preponderance of the evidence,

"1. That the stretch of ice on the creek north of the culvert was a place where children of tender years commonly gathered and played and used during the spring or late winter of 1945, and that

that this [*sic*] fact was known to defendant or its agents, or should have been known by them if they had exercised reasonable care.

"2. That when the defendant steamed these holes through the ice north of the culverts it knew or should have known in the exercise of reasonable care that these holes would likely grow larger in diameter and to such an extent that children might fall in them and be injured thereby.

"3. That in the exercise of due care defendant ought to have anticipated that some child might be injured because of the holes they had caused to be made through the ice.

"4. That the boy, Ronald, fell through one of these holes that had been steamed through the ice by the defendant and was drowned."

The evidence is conclusive that the stretch of ice in question was used by children of the neighborhood for skating and sliding during the winter of 1944-1945 and for many winters prior thereto. For several years, defendant had caused holes to be steamed through the ice, which the city knew or in the exercise of reasonable care should have known, through water action, tended to grow larger and larger. The evidence supports the conclusion that the city knew or should have known the facts as they existed and the dangerous conditions which it had created. The jury was justified in finding that the city might well have anticipated an accident such as this involving a small child.

The city contends that under the facts presented here no liability attaches to it and that it violated no duty to Ronald Harning. In support of its position, it cites cases which in its opinion are controlling. They are Dehanitz v. City of St. Paul, 73 Minn. 385, 76 N. W. 48; Stendal v. Boyd, 73 Minn. 53, 75 N. W. 735, 42 L. R. A. 288, 72 A. S. R. 597; Kohler v. W. J. Jennison Co. 128 Minn. 133, 150 N. W. 235; Dorgan v. City of St. Paul, 138 Minn. 347, 165 N. W. 131. We shall not take the space to point out the features of the instant case which distinguish it from the cases enumerated above. A casual reading of them convinces us that they have no application here.

The recent case of Schmit v. Village of Cold Spring, 216 Minn. 465, 13 N. W. (2d) 382, 154 A. L. R. 1325, has features similar to the instant case. There, an open flare had been placed as a warning in front of an open trench in one of defendant's streets. For some weeks, while work had been going on, children played in the sand around the excavations. Several small children, including plaintiff, six years old, in the evening while it was quite dark, were standing around one of the burning flares. Plaintiff was severely burned. This court said (216 Minn. 467, 13 N. W. [2d] 384):

"It is settled in this state that a municipality owes a duty of care toward children using the streets for recreation and play. Barrett v. Village of Princeton, 135 Minn. 56, 160 N. W. 190. Znidersich v. Minnesota Utilities Co. 155 Minn. 293, 296, 193 N. W. 449, 450. This court no longer recognizes a distinction between 'attractive nuisance' cases and other negligence cases, but does recognize the diligence required when attractive or alluring instrumentalities are placed where children are known habitually to play. In Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 536, 261 N. W. 194, 196, we said of the attractive nuisance theory:

" '* * * It is but a convenient phrase to designate one sort of case within the ordinary rule that one is liable for injury resulting to another from failure to exercise, for the protection of the injured child, the degree of care commensurate with and therefore demanded by the circumstances. The greater the hazard the greater the care required.'

\* \* \* \* \*

"The evidence in the case at bar shows that the accident occurred in an unimproved residential street in a small village. It tended to prove that there were a large number of small children in the neighborhood; that for several weeks, as the work progressed, they had played in the street and around the sand pile caused by the excavation; and that they had gathered like 'flies' around the open flares after the workmen left. From this evidence the jury could well conclude that the village officers were chargeable with knowledge of the

children's habit of playing around the flares and should have reasonably anticipated some injury to them. * * *

"This does not mean that we would arrive at the same conclusion if flares of this type were used at a place where children were not known to be in the habit of playing."

In the instant case, in order to protect one of its streets and also private property, the city invaded a children's playground on private property, which it knew or in the exercise of reasonable care should have known was such and created a dangerous condition, which directly resulted in the death of a child. The jury could well find from the evidence that the city was responsible for the existence of the dangerous situation. The children were not trespassers or licensees. They had a right to be on the ice and play on it. It was a safe playground until the city made it unsafe. See, also, Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 205 N. W. 889, 45 A. L. R. 973; McLeod v. City of Duluth, 174 Minn. 184, 218 N. W. 892, 60 A. L. R. 96; Stadtherr v. City of Sauk Center, 180 Minn. 496, 231 N. W. 210.

■ Defendant charges prejudicial misconduct on the part of plaintiff's counsel. The mother of deceased took the witness stand. Her six-year-old daughter was sitting alongside of her. Counsel showed the mother a photograph of her two children, the daughter and the boy who had drowned. She burst into tears, as did the daughter. We do not see, any more than the trial court did, as it vigorously stated in its memorandum, any legitimate purpose in producing the photograph, as was done there. We see no issue in the case that made it competent. The city feels that the case was not tried on its merits, but on calculated sympathy, and insists on a new trial because of this misconduct. After careful consideration, we are following the conclusion reached by the trial court, namely, that the misconduct did not create such prejudice as to necessitate a new trial.

■ Defendant also complains of the size of the verdict. Deceased was a healthy, normal, bright boy four years of age. The verdict was for $3,350. We do not consider it excessive.

Other claimed errors are set out. We have not overlooked them. They are not such as to change the result.

Order affirmed.