## HODGES v. UNITED STATES.
### Civ. 209.

United States District Court
S. D. Iowa, E. D.
Dec. 16, 1948.

J. O. Boyd and Logan Huiskamp, Keokuk, Iowa, for plaintiff.

Maurice F. Donegan, U. S. Atty., Davenport, Iowa, Wm. R. Sheridan, Asst. U. S. Atty., Keokuk, Iowa, Cloid I. Level, Asst. U. S. Atty., Des Moines, Iowa, for defendant.

DEWEY, District Judge.

This is an action brought against the Government under the Federal Tort Claims Act and grows out of the unfortunate death of a child, James Martin Hodges, caused by his falling into a river lock owned and operated by the Government at the Keokuk Dam at Keokuk, Iowa.

The Act of Congress under which the action is authorized is Sections 1346, 2674, and Section 2401 of Title 28, U. S. Code.

The parties accept the law, not only as authorizing suits against the United States on tort actions as against the Government in the same manner and to the same extent as private individuals would be liable under like circumstances as limited by the Act, but that laws of the State where the action arose are applicable.

The evidence does not disclose whether the deceased fell into the lock in Iowa or Illinois, but the parties in their arguments assume that it was in Iowa and, as under the laws of Iowa, the dividing line between states is the center of the river channel, it will be considered that the channel was in the center of the lock and, as the boy fell into the lock from the Iowa side of the lock, the Iowa law prevails.

The facts are not greatly in dispute. The deceased comes from a large family. On Aug. 19, 1947, two or three of his older brothers had gone down to the lock for their own entertainment and for fish, and this young chap, who was under 5 years of age, and a brother about six, had run away a time or two and finally succeeded in escaping from the controls at home and made their way upon an abutment on the west side of the lock proper. They had not been there very long when the accident occurred.

The federal works at Keokuk, of which the lock for the passage of the boats is a part, consists of a dam across the river with openings therein which permit the force of the water to turn large turbines and generate electricity which is transported on heavy wires to St. Louis.

On the Iowa side of the dam is a large drydock and adjoining it is the lock proper. The dam across the river extends in an

easterly and westerly direction and the lock is, for descriptive purposes, north and south. At the north end of the lock the water is held back by a gate operated vertically by machinery, and when the lock is to be opened at the north end, the gate is dropped. This gate is about six or eight feet in width and often when it rises from the water fish are flapping on its top side.

The lower or south end of the lock is closed and opened by two large swinging gates. When these gates are not in use they fit in recesses in the cement abutments at the side of the lock and are operated by machinery to open and close them as needed. When the lock is closed the water escapes from the sides by means of subterranean passage ways and as the water is lowered a boat going down stream is lowered until it is on a level with the water below it when the gates at the south end are opened and the boat proceeds down the river. Conversely, when a boat is passing up the river, it enters the lock at the south end and then the gates at that end are closed and the water is permitted to flow therein by subterranean channels from above which raises the water level and the boat to a level of the lake which is north of the dam.

When the water is in the lock at a level with the water below the dam, it is about 40 to 45 feet below the top of the cement abutments on the east and west of the lock. The abutment on the west of the lock and inside the State of Iowa is some 30 or 40 feet in width (the evidence does not disclose this item and I take this fact from the photographs introduced in evidence), and is a part of a passageway from the street to the power house containing the machinery which generates the electricity and wherein are stationed officers and employees.

The plats introduced in evidence as Exhibits 9 and 10 show the general location of the lock chamber, the drydock and the approaches thereto. On Exhibit 9 is shown the access walk from Water Street in the city of Keokuk to the south end of the west abutment to the lock. Those having business or a desire to visit the power house can evidently use either the west or east abutment, passing across the lock at the north or south end upon the gates when they are not in use and continuing to the unused power house and finally to the power house itself. The access walk, as I understand the evidence, is open at all times.

The abutment to the west, which is a part of the passageway so described, is used by the public generally and attracts many people, old and young, as it is a very advantageous location as a lookout to observe the many activities on the river and to watch the passage of boats through the lock. It is also used by employees going to and from the power house as well as by the public generally who either have business there or go to the power house for pleasure and educational purposes.

There is no barrier of any kind to the passage of people from the street up the stairs to this abutment on the west side of the lock and across this abutment lengthwise towards the power house. There is a rail next to the lock. This guard rail is about 3½ feet from the edge of the lock and at the gates it is about two feet from the edge. At the north and south ends of the lock where the passage is across the gates, there is a chain which is strung across the walk to prevent the passage of people across the top of the gates when the gates are open.

These railings are about three feet high and are constructed of 2 inch pipe, the first being about 18 inches from the ground and the second, or top one, being about 18 inches from the lower pipe. No other barrier is on the abutment west of the lock and there is an open space on the entire surface of the abutment; and on its east edge there is a sheer drop when the water is low in the lock, as I have said, of about 40 to 45 feet.

The plaintiff has plead and the defendant admits the following:

"Paragraph 4. That at the time and on the occasion hereinafter described, the Defendant, United States, through its Army Engineers, their agents and employees, was operating on the west bank of the Mississippi River adjacent to the City of Keokuk, Iowa, and at a place very near the residence of Complainant's decedent a lock, dry

dock, boat building and repair shops and appurtenant works; that said lock, dry dock, shops and appurtenant works were instrumentalities used and operated by the defendant as a whole in the aid of navigation up and down the Mississippi River.

"That said works consisted of boat building and repair shops containing machinery and adjacent thereto piles of lumber, rope and other boating supplies; a large dry dock into which boats, both large and small, could be placed on iron racks for access in making repairs by means of filling and emptying said dry dock of water to aid in the manipulation of said boats in the matter of being examined and repaired; a large lock, wide, deep and long by means of which boats, barges, tugs and other water craft could be passed from a higher water level above to a lower water level below. * * *

"That the river traffic caused much activity in and about the lock,—such as the raising and lowering of the water in said lock, the opening and shutting of the gates, or raising the upper gate and as it would come to the surface there would be fish almost invariably flapping thereon, which fish could be picked up by visitors or spectators, including children, who might be there, the boats, barges, tugs and other water craft in movement for passage through said lock, etc. * * *"

The deceased was not seen to fall from the abutment, but it is known that he was on the Iowa abutment and at the south end of the lock a few minutes before his brother screamed and the body was seen at the southwest corner of the lock. His hand appeared above the water for a very short time and then disappeared. The attendants did all that they could in the way of throwing him a life buoy and using grappling hooks to raise the body as soon as possible, but despite all of their efforts and those of the fire department to resuscitate him, he was dead when his body was raised from the water.

At the time of his death, August 19, 1947, he was four years, seven months and 27 days of age and was a strong active boy in good health with an active and alert mind.

There does not seem to be any question from the evidence but that the public generally was invited to use the top of this abutment on the west side of the lock and children played there, more especially during their vacations in the summer time. On the day of the accident one of the employees told the boys that they ought to go home as they might get hurt, but he says he didn't tell them they had to leave, as he understood the place was a public one on which people had the right to congregate and use. It therefore appears that the public was expected and welcomed on this abutment and that it was used to a large extent by sightseers both old and young.

Plaintiff claims that the Government was negligent in permitting children to be on and about the premises and in not erecting barricades to keep children away from the walls of the lock.

Having determined that the applicable law is that of the State of Iowa, it is necessary to first determine from the evidence and the law the relationship of the deceased to the Government at and immediately prior to the time of his death.

Iowa appears to make a sharp differentiation in the duty of the owners of real estate to different classes of persons who may be on or about the same. They are classified either as "trespassers," "bare licensees," or "licensees by express or implied invitation." This last distinction is often referred to in the cases as an "invitee," either express or implied.

The only duty owing to a "trespasser" is to refrain from wilfully injuring him and the duty to a "bare licensee" is not to wilfully or wantonly injure him. The owner of property should not knowingly let a bare licensee run into a hidden peril or wantonly cause him harm. The duty owed to a "licensee by implied invitation" is the necessity to exercise due care to see that he is not injured on or about the premises. Mann v. Des Moines Ry. Co., 232 Iowa 1049, 1063, 7 N.W.2d 45; LaSell v. Tri-States Theatre Corp., 233 Iowa 929, 11 N.W.2d 36; Keeran v. Spurgeon Mercantile Co., 194 Iowa 1240, 1242, 191 N.W. 99

27 A.L.R. 579; Davis v. Malvern L. & P. Co., 186 Iowa 884, 888, 173 N.W. 262.

The Mann case is authority for the doctrine that to be an invitee it is not always necessary that the person upon the premises is thereon for business of mutual interest or in connection with the business of the owner, although this limitation does apply to mercantile establishments, as entering a store to transact business. Wilson v. Goodrich, 218 Iowa 462, 252 N.W. 142.

However, such an interest is not required to enable a licensee by invitation, either express or implied, to recover against the owner or occupant in other cases. Mann v. Des Moines Ry., 232 Iowa 1049, 1065, 7 N.W.2d 45. That case also lays down the rule that—continued use of real property by a trespasser or a bare licensee, with the knowledge and consent of the owner, its officers or agents may ripen into an implied invitation to use the premises.

And in 38 American Jurisprudence, in Section 98 under the title of Negligence, is found this expression: "A person may become an invitee to whom the owner of premises is under a duty to maintain them in a safe condition, when he is expressly invited to come on the premises, or when, from the construction of buildings or use of the premises, such an invitation may be implied. An invitation to enter may be implied from conduct of the owner or occupant, or of someone else with his permission, which he knows, or reasonably should know, might give rise to the belief, in a mind of a person ordinarily discerning, that the owner or occupant intended such person to come upon the premises."

In an approved instruction in the case of Mann v. Des Moines Ry. Co., 232 Iowa 1049, 1057, 7 N.W.2d 45, 51, appears the statement that: " 'A licensee by implied invitation is one who has been invited to enter upon the land either by the owner or occupier of the same by some affirmative act done by such owner or occupant, or by appearances which justify persons generally in believing that such owner or occupant had given his consent to the public generally to enter upon or to cross over his premises, and while such licensee is acting within the scope and limit of such implied invitation he has the lawful right to be where he is so invited.' "

In the case of Wilmes v. Chicago G. W. R. Co., 175 Iowa 101, 107, 156 N.W. 877, 879, L.R.A., 1917F, 1024, the Supreme Court of Iowa says: "One who enters upon the property of another can only complain of the manner in which another maintains his property, when he is able to show that he is rightfully upon the other's property by invitation or otherwise. This invitation need not be expressed. It may be implied from the relationship or the conduct of the parties. The invitation may be found in the conduct of the party, in the use of his property, and in the manner in which it is maintained."

And, quoting from the case of Edgington v. Burlington, C. R. & N. R. Co., 116 Iowa 410, 90 N.W. 95, 57 L.R.A. 561, the court said: " 'If [however] the owner take away the fence, throwing his lot open in unused and unimproved condition, leaving the public to swarm over and across it and children to play upon it, he cannot be held innocent of wrong if by his act the semi-public use of his property is made hazardous to human life, and he fails to take reasonable precaution against the danger thus occasioned.' "

And continuing the court stated: "The duty to maintain it in a safe condition is measured by the use to which the property is put, and the danger to others which may be reasonably anticipated to result from the condition in which it is kept."

In addition to the evidence as to the right of the public generally to use this abutment and to congregate thereon for their own interest and pleasure, is the testimony of Albert Van Ausdall, an assistant lock master, who testified—that he saw some of these children on the abutment and near the south end of the lock as he was leaving work about 4 o'clock on the evening of the accident. He told them that they had better go home before one of them fell in the river and was drowned. The boy that was killed was not in the crowd of boys that was so warned and, on cross-

examination, he said, that he didn't believe that he had a right to force anybody off the lock, as they were permitted on the lock, but he thought at their age they shouldn't be on the lock, although they were permitted to be there. That the public was permitted to come on the lock as it pleased.

From this and other evidence it is very apparent that these children were on the lock with the permission of the Government and their presence there had continued for such a length of time and was of such a nature, that it can hardly be said that they were mere licensees, but rather that they were there upon an implied invitation and should have been protected by the exercise of due care.

The case then turns upon whether or not the defendant exercised due care with the knowledge that it had of the dangerous character of the works and the immaturity of the children.

The facts above stated that the only barrier to protect people from falling into the lock was an iron pipe fence makes it hardly necessary to quote authorities to the effect that this would not be sufficient to protect a child from falling off the abutment. It was natural for him to be attracted by his interest in the waters in the lock and the machinery and appliances in connection therewith.

However, the doctrine is stated in 38 American Jurisprudence under Section 90 of the law on Negligence, as follows: "An affirmative, although not an absolute duty, is imposed upon him, not only of discovering hidden perils, but of preventing injuries to persons to whom he is obligated to use due care, by giving warnings of danger, erecting sufficient guards, and installing equipment calculated to reduce the peril."

■ And as said in the case of Dahna v. Clay County Fair Ass'n, 232 Iowa 984, at page 988, 6 N.W.2d 843, at page 845; "The test, after all, is, would ordinary prudence have suggested to the person sought to be charged with negligence that his act or omission would probably result in injury to some one?"

Here there was a notice on the fence for users of the abutment to keep on the inside thereof, but this would not be a warning to a child of the age of the deceased. Neither would the fence be a notice to him that he wasn't to approach closer to the edge of the abutment. He was too immature to be able to read or appreciate the dangerous situation in which he was permitted to be placed. And this was recognized by the attendant when he told the children that they ought to go home or one of them might be drowned.

The plaintiff claims that his case is within the doctrine of "attractive nuisance." This doctrine of attractive nuisance is a recognized one in the State of Iowa since the case of Edgington v. Burlington, C. R. & N. R. Co., 116 Iowa 410, 90 N.W. 95, 57 L.R.A. 561. But this doctrine of attractive nuisance or attractive agency applies to cases where the children are trespassers. The children here were not trespassers as the parties in charge expressly state that they had a right to be on the abutment and on or about the lock.

■ Defendant claims that the deceased was guilty of contributory negligence. Under the rules of law in this State it is recognized that a child under seven years of age is presumed to be incapable of being guilty of contributory negligence. Brekke v. Rothermal, 196 Iowa 1288, 1294, 196 N. W. 84.

But the defense of contributory negligence is urged further on the ground that the parents were negligent in permitting the child to be on the locks and, as they are the beneficiaries of any recovery herein, the rule of imputed negligence applies. The case cited by the Government on this proposition is from a court other than Iowa, which does not have such a rule. See Edgington v. Burlington, C. R. & No. Ry., 116 Iowa 410, 90 N.W. 95, 57 L.R.A. 561. However, apart from the rule of law, there is no evidence that either the father or mother of the child was negligent in any manner or in any degree which contributed to the child being on the abutment on the day it fell into the lock.

The Government also claims that to allow damages to the estate of the decedent in this case would be purely speculative and that, even if it should be held liable, that the recovery should be only for a nominal amount.

The Supreme Court of Iowa has, however, allowed damages for the wrongful death of a minor child in many cases but, no doubt from its speculative character, their allowance of such damage has been reduced in several cases and are comparatively small.

The most recent case is that of Anderson v. Strack, 236 Iowa 1, 17 N.W.2d 719. In this case the Supreme Court of Iowa approved a judgment for $4,500 to the estate of a six year old child.

Other cases in which the Supreme Court of Iowa have passed upon the question of the amount of recovery are as follows:

Eginoire v. Union County, 1900, 112 Iowa 558, 84 N.W. 758, verdict of $3500 reduced to $2500 approved for wrongful death of an eight year old girl.

Hively v. Webster County, 1902, 117 Iowa 672, 91 N.W. 1041, $6000 judgment reduced to $3000 in death of 4 year old child.

Farrel v. Chicago, R. I. & P. R. Co., 1904, 123 Iowa 690, 99 N.W. 578, $3000 verdict approved in death of 8 year old girl.

Ellis v. Republic Oil Co., 1906, 133 Iowa 11, 110 N.W. 20, $3000 verdict approved in death of 15 year old girl.

Crawford v. McElhinney, 1915, 171 Iowa 606, 154 N.W. 310, $3,300 judgment approved in death of 8 year old child.

McDowell v. Interstate Oil Co., 1931, 212 Iowa 1314, 237 N.W. 456, $3500 judgment approved in death of 7 year old boy.

Allen v. Des Moines Ry. Co., 1934, 218 Iowa 286, 253 N.W. 143, $5750 verdict reduced to $4500 for death of 8 year old boy.

Lenth v. Schug, 1938, 226 Iowa 1, 281 N. W. 510, 287 N.W. 596, $6000 verdict reduced to $4500 for death of 10 year old child.

From the above cases this court is warranted in allowing damages to the estate of James Martin Hodges in the amount of five thousand dollars.

The court therefore makes the following

## Findings of Fact.

1. That on or about the 19th day of August, 1947, the defendant owned and operated a river lock in the Mississippi River adjoining the city of Keokuk, Iowa.

2. That on and prior to said date, the defendant through its employees, servants and agents permitted children on and about the locks and invited the public generally to use the locks for pleasure and educational purposes.

3. That on or about said date one James Martin Hodges, a child under 5 years of age, was on and upon an abutment on the west side of said lock and fell into the same causing his death.

4. That at and immediately prior to the time of this accident the boy was on the abutment of the lock as an invitee of the defendant.

5. That at said time and place, the defendant owed a duty to minor children and invitees on and upon said premises to use ordinary care for their protection and that it failed in this regard, in that, there was not a sufficient barrier on and upon the abutment to its locks to protect a child using the same.

6. That the child James Martin Hodges was not guilty of contributory negligence on its part, nor were the parents of the child guilty of negligence which could be imputed to them in any manner or in any degree.

7. That the damage to the estate of the deceased is the sum of $5000.

## Conclusions of Law.

1. That this case is controlled by the laws of the State of Iowa.

2. That at and immediately prior to the time of the death of James Martin Hodges, a child under 5 years of age, he was an invitee of the Government to be on and about said locks in a place of danger and that said danger was known to the Government,

its officers and employees, but was unknown to the child by reason of his immaturity.

3. That by reason of the child, at the time and place of its falling to its death in defendant's lock, being an invitee thereon, the Government owed to it a duty to exercise ordinary care for its safety.

4. That the death of the child was caused by the negligence of the defendant, its agents and employees, in failing to have a proper barrier or protection for a child rightfully on and about the premises.

5. That neither the child nor its parents were guilty of contributory negligence which in any manner or in any degree contributed to the child's death.

6. That this plaintiff is entitled to recover as against the defendant in the sum of Five Thousand Dollars, and costs, which the court finds as the amount of damage to its estate.

7. That the attorneys for the plaintiff, Messrs. Boyd & Huiskamp of Keokuk, Iowa, are entitled under Sec. 2678, Title 28 U.S.Code, to an attorney's fee of twenty per cent of the amount of this recovery ($5000) for services rendered, to be paid out of the judgment entered against the Government.

The court therefore enters the following order:

The above entitled action having come on for hearing on its merits in open court at Keokuk, Iowa, on November 22–23, 1948, the same was argued and submitted, and being advised.

The Court finds for the Plaintiff and that he is entitled to recover against the defendant in the sum of Five Thousand Dollars, and costs as provided by Secs. 2412, Title 28 U.S.Code, and the Clerk is authorized and directed to enter judgment in favor of the plaintiff and against the defendant in said amounts; that twenty per cent, or $1000, shall be paid to the attorneys for the plaintiff, Messrs. Boyd & Huiskamp of Keokuk, Iowa, for services rendered.

To all of said findings of fact and conclusions of law and to this order, the defendant excepts.