**HARRIS v. UNITED STATES.**

**DILLEY v. UNITED STATES.**

Civ. Nos. 3851, 3852.

United States District Court
D. Minnesota, Fourth Division.

April 17, 1953.

Lauerman, Johnson & Gustafson, of Olivia, Minn., and Streissguth, Berens & Rodenberg, by R. T. Rodenberg, of New Ulm, Minn., for plaintiffs.

Philip Neville, U. S. Atty., and William W. Essling, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

NORDBYE, Chief Judge.

The Crow River flows north through the Village of New London, Minnesota. Within the boundaries of this village, an artificial dam across the river has been in existence for approximately a century. A mill was formerly located near the dam and utilized the water power which the dam created. In 1938, the State of Minnesota became the owner of the dam and the surrounding property. Apparently the State obtained this property to control the water level for scenic purposes in that the water in the Crow River above the dam became a sizable lake, and also to supply water for a fire pumping station situated on the west bank of the river near the dam site. Prior to this time, the Government had located some fish rearing ponds some distance west

of the dam, and the State's interest in procuring the dam site may have been partly motivated in cooperating with the Federal Government in its fish rearing program. However, in 1940 the State of Minnesota conveyed a limited interest to the United States in a part of the land formerly occupied by the old mill property. The deed provided, among other things, that the fee title to the lands and the easement conveyed should revert to the State of Minnesota upon the failure of the United States to use the premises for the purpose of a fish hatchery for any period of five consecutive years. The property thus conveyed lies below the dam and does not include any part of the dam site or its appurtenances. Thereafter, a fish hatchery building was erected and maintained by the United States on a portion of the property thus conveyed. The limited deed provided that the United States should have an easement to such water from the mill pond by gravity flow which should be required for the operation of the fish ponds and the hatchery. The fish hatchery is situated immediately below the dam, and the water therefor is obtained through a four-inch pipe from the mill pond immediately above the dam and apparently this water supply is augmented by water derived from a nearby well. The water thus obtained is discharged through the four-inch pipe after leaving the fish hatchery into the river below the dam, but the amount of water thus utilized has no appreciable effect upon the current or the size of the river into which the water is discharged. There is an overflow flume and a large pipe for water flowage which connects the old mill wheel tower and the water control structure in the dam. These structures have existed since the dam was utilized by the old mill for power purposes. The flowage of water, however, is subject to the control and regulated solely by the State of Minnesota. The Federal Government exercises no control over the dam or the amount of water coming through the flume or through the large pipe referred to. In the springtime when the water is high, and with the water flowing through the over-flow flume and

through the large pipe connected with the mill wheel tower, there is a swift current immediately below the dam at the confluence of these two water outlets and the water is deeper at this point and more turbulent than lower down in the stream.

Adults, and children especially, have for many years been in the habit of playing immediately below the dam in the raceway and playing along the east banks of the river. It is the east bank of the river immediately below the dam for a few hundred feet or more which is in the possession of the United States under its limited deed from the State of Minnesota. This east bank is not precipitous and there is nothing abnormal or unusual in the bank itself which would render the area dangerous. However, it is quite apparent that if young children attempted to wade in the river immediately below the dam, particularly in the springtime, the current might cause them to lose their balance. However, nothing had occurred prior to the accident which would cause a reasonably prudent person to suspect that children would be in any particular danger if they fished or played along the banks of the river, as children have always been wont to do. The Government in conducting its fish hatchery had done nothing to create any abnormal condition or any hazard. It accepted the premises as they were and only constructed the hatchery building and the necessary accessories for the flow of water through the four-inch pipe into and from the fish hatchery. At the time of the accident, no water was flowing through this pipe, and hence no water was being diverted for government purposes from the mill dam above into the stream below or from the auxiliary well.

On May 17, 1951, two children, Susan Dilley and Joyce Harris, each five years of age, apparently left their respective homes in New London together. Their homes are located relatively a short distance from the mill dam. No federal employee knew of their presence near the hatchery or along the river prior to the unfortunate tragedy. When they were missed by their parents at about two o'clock P.M. that day, a search followed and their shoes and stockings

were located near the old mill wheel close to the hatchery building and on the portion of the river bank covered by the deed to the United States. Where they may have entered the river, no one knows. Their bodies were found some 700 to 1,000 feet downstream in the river alongside private property. It would appear that some place between where their shoes and stockings were found and where their bodies were located, they entered the river, presumably for the purpose of wading, and then lost their balance and drowned, and were carried along by the current. It is, of course, entirely possible that their entry into the river, as well as their mishap which caused them to drown, occurred at a place below the property deeded as aforestated to the United States.

Plaintiffs predicate negligence on the part of the Government in not maintaining a fence on the east bank adjacent to the swift part of the river as it flows immediately below the dam and in not maintaining a watchman to guard that portion of the stream. It is urged that government employees should have known of the habit of children to be attracted to water, particularly swift-flowing water, and to have left this portion of the stream unfenced and unguarded was negligence. That the employees of the fish hatchery knew that from time to time children were in the habit of fishing and playing along this portion of the stream fairly appears from the evidence. However, the United States did not create any dangerous situation along the Crow River. Any danger to children playing along the river bank had existed for years and years prior to the Government's utilization of the portion of the premises devoted to the fish hatchery. Whatever the United States did in maintaining the fish hatchery on the east bank of the river in no way increased or contributed to any danger which the mill stream may have occasioned. The condition which existed when the children met their deaths had existed long before the United States established its fish hatchery on these premises. The control of the dam and the amount of water permitted to be flowed through the spillway was not vested in the Government, nor did the Government exercise any supervision thereof. Moreover, at the time of the accident, no water was being emitted from the pipes of the fish hatchery, so it is clear that no artificial increase of the stream was caused by anything done by reason of the operation of the fish hatchery. Under these circumstances, it would seem that there is an absence of any act of omission or commission on the part of any employee of the Government which can form the basis of a claim against the Government under the Federal Tort Claims Act. 28 U.S.C.A. §§ 1346, 2671 et seq. Whatever allurement or enticement there would be to children in being attracted to this part of the river was not of the Government's creation or doing. The Government did not maintain this alleged dangerous condition. It existed through no act of omission or commission on the part of the Government's agents or employees.

It must be emphasized again that the dangerous situation alleged here, to wit, the turbulence of the water and the swiftness of the stream was not a condition maintained by the Government. It would be a startling principle of negligence law if every property owner along a stream or river should be responsible for mishaps resulting from turbulence in water or currents in a stream alongside his property when such conditions are in no way the result of his doing and in no way under his control. Minnesota has adopted the rule of Restatement, Torts, § 339, that

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or

702

realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

But it will be readily observed that the first condition laid down by this rule is not present here because the Government did not cause or maintain the alleged dangerous condition. Consequently, the Minnesota cases upon which plaintiffs here rely, to wit, Gimmestad v. Rose Brothers Co., Inc., 194 Minn. 531, 261 N.W. 194; Harning v. City of Duluth, 224 Minn. 299, 28 N.W.2d 659, and Meagher v. Hirt, 232 Minn. 336, 45 N.W.2d 563 are readily distinguishable on their facts, because in all of these cases the defendant held liable created the condition which was dangerous to the children. Moreover, the case of Hodges v. United States, D.C.S.D.Iowa, 98 F.Supp. 281, will not aid plaintiffs herein .in that the Government there operated a river lock with a cement abutment which was frequented by the public, and it clearly created and maintained a condition which was knowingly used by children as a sort of playground during their vacations, especially in the summertime. The situation presented here is indeed somewhat analogous to the position of a property owner whose property abuts a busy street where motor vehicles pass to and fro in large numbers. Obviously, children playing in a yard adjoining such a street may be subject to danger in the event they should run out into the street, but it would scarcely be suggested that the property owner in whose yard they play owes any duty to supervise the playing of the children or to safeguard them from running into the street.

The Court adopts the foregoing as his findings of fact, and as conclusions of law finds that plaintiffs are not entitled to recover herein and that defendant have judgment for its costs and disbursements herein. Let judgment be entered accordingly.

An exception is allowed.